Los Esposos Lydia E. Alicea y Natanabel Lugo, demandantes y recurridos, *v.* Dr. Carlos E. Córdova Iturregui y Dr. Marcos López Reyes, demandados y recurrentes, Estado Libre Asociado de P. R., interventor y peticionario, Luis F. Casanova Velázquez et al., demandantes y recurrentes, *v.* Dr. Amado C. Pastor et al., demandado y recurrido.

*Números:* O-85-250
O-85-190
R-85-248

*Resueltos:* 30 de junio de 1986

*Álvaro R. Calderón, Jr.,* y *Gladys E. Guemarez,* del bufete *Álvaro R. Calderón, Jr.,* abogados del peticionario Dr. Marcos

678

López Reyes; *Américo Serra, Procurador General Interino* y *Carmen A. Bravo de Riefkhol, Procuradora General Auxiliar,* abogados del peticionario Estado Libre Asociado de Puerto Rico; *Fidel Cruzado Vega* y *Eliel Quiñones Montalvo,* de *Cruzado y Quiñones,* abogados de los recurridos.

*Ramón L. Walker Merino* y *Héctor M. Alvarado Tizol,* de *Alvarado Tizol y Walker Merino,* abogados de los recurrentes; *Carlos E. Ríos Moreu,* de *Cancio, Nadal y Rivera,* y *Edna Abruña Rodríguez* de *Abruña, Barreras, Cruz Ojeda y Morales,* abogados de los recurridos.

El Juez Asociado Señor Ortiz emitió la opinión del Tribunal en las partes I y III.

Los presentes casos consolidados tienen un elemento en común: en ambos se impugna la constitucionalidad de la última oración del Art. 41.090(1) del Código de Seguros, 26 L.P.R.A. sec. 4109(1), al fijar un término máximo de dos años para la iniciación de una acción por impericia médico-hospitalaria. La referida sección establece:

(1) Los términos de prescripción contenidos en esta sección serán los únicos aplicables a las acciones de daños por culpa o negligencia (*malpractice*) que se inicien contra profesionales en el cuidado de salud e instituciones para el cuidado de salud.

La acción por alegados daños por culpa o negligencia (*malpractice*) comenzará, independientemente de lo dispuesto en otra ley, dentro de un año a partir de la fecha en que ocurrió el daño que dio lugar a la acción, o dentro de un año desde el momento en que el daño fue descubierto o debió haber sido descubierto con la debida diligencia. *En ningún caso se podrá iniciar la acción más tarde de dos años, desde la fecha en que ocurrió el daño que dio lugar a la causa de acción.* (Énfasis suplido.)

Por los fundamentos que expondremos a continuación resolvemos que la limitación de dos años resulta inválida por ser

contraria a las cláusulas constitucionales sobre igual protección de las leyes y debido proceso de ley.

En el primer caso[1] la codemandante Lydia Alicea recibía tratamiento con los odontólogos doctores Córdova Iturregui y López Reyes. Era paciente habitual del doctor Córdova. El 26 de diciembre de 1981 visitó su consultorio para la extracción de una muela. En dicha ocasión la atendió el doctor López quien le encontró una pelotita dura que le impidió extraer la muela. Le recetó antibióticos y le dio una cita posterior con el doctor Córdova.

En 1982 la señora Alicea regresó al consultorio donde el doctor Córdova le tomó una radiografía. El 15 de marzo le hizo una limpieza oral y el 29 de abril la sometió a una intervención quirúrgica por tener una infección en el área tratada. La demandante alega tener serios problemas en el área oral desde entonces. Posteriormente otro galeno, el Dr. Ángel Otero Viera, le informó que padecía de parestesia[2] postquirúrgica en el lado izquierdo, posiblemente permanente.

La demandante y su esposo instaron acción en daños y perjuicios el 6 de marzo de 1984 contra los doctores Córdova y López. El doctor López presentó moción de sentencia sumaria donde alegó que su única intervención con la señora Alicea había ocurrido el 26 de diciembre de 1981, por lo que cualquier daño que él particularmente le pudiese haber ocasionado ocurrió en dicha fecha. Invocando el término prescriptivo de dos años del Art. 41.090, alegó que la acción contra él instada estaba prescrita.

El Tribunal Superior de Bayamón, por voz del Juez Enrique Rivera Santana, emitió una opinión y resolución en la que resuelve que la última oración del referido artículo es

---

[1] Recursos O-85-190 y O-85-250.

[2] Sensación anormal, rara, alucinatoria, táctil, térmica, etc., de los sentidos o de la sensibilidad general. *Diccionario Terminológico de Ciencias Médicas,* 8va. ed., Barcelona, Ed. Salvat, 1963, pág. 910.

inconstitucional y que el término que tenía la demandante para iniciar su acción era de un año a partir del conocimiento del daño, *Ortiz* v. *Municipio de Orocovis*, 113 D.P.R. 484 (1982), habiendo sido, por ende, presentada en tiempo. [3] De ésta recurren, en casos consolidados, el demandado doctor López y el Procurador General en nombre del Departamento de Justicia y el E.L.A.

En el otro caso, [4] el 6 de febrero de 1981 la codemandante Idida Seguí Class fue intervenida quirúrgicamente por el Dr. Amado Pastor para practicarle una histerectomía [5] por un fibroma en el útero. Alega que cierto tiempo después comenzó a sentir dolores y síntomas extraños en el área abdominal y acudió nuevamente al doctor Pastor. Éste le ordenó unas radiografías, tomadas el 23 de febrero de 1984, las cuales revelaron la existencia de unas pinzas que, en el curso de la operación practicada, habían sido dejadas en su abdomen. En ese momento, según alega la demandante, es que se entera de la existencia del daño. Como resultado de ello tuvo que ser sometida a una segunda intervención para la remoción del objeto.

La demanda fue presentada el 21 de marzo de 1984, o sea, un mes después de enterarse del daño. El doctor Pastor presentó moción de desestimación en la que alega que la demanda está prescrita por ser presentada después de cumplirse el término de dos años establecido en la referida Sec. 4109 (1). La parte demandante presentó una "Segunda Moción Complementaria en Oposición a la Moción de Desestimación" en la que ataca directamente la constitucionalidad de la referida sección.

---

[3] Esta interpretación era la utilizada en los casos anteriores a la Ley Núm. 74 de 1976, en la que era de aplicación el Art. 1868 del Código Civil, 31 L.P.R.A. sec. 5298. Véase *Colón Prieto* v. *Géigel*, 115 D.P.R. 232 (1984).

[4] Recurso R-85-248.

[5] Operación de extirpar parcial o totalmente el útero por vía vaginal o abdominal. *Diccionario Terminológico de Ciencias Médicas, op. cit.,* pág. 609.

El Tribunal Superior de San Juan dictó sentencia sumaria a favor de los demandados, sin entrar a considerar la constitucionalidad de la sección, fundamentándose en que la facultad de derogar la misma reside en la Asamblea Legislativa. De dicha sentencia recurre ante nos la parte demandante en solicitud de revisión.

## I

Durante los años setenta en Estados Unidos surgió una crisis económica en el cuidado de la salud. Dicha crisis se manifestó en un incremento en la cantidad de demandas por daños por culpa o negligencia con su correspondiente aumento en los costos de los servicios médicos y una escasez en la disponibilidad de seguros para los médicos y hospitales. J. P. Witherspoon, *Constitutionality of the Texas Statute Limiting Liability for Medical Malpractice*, 10 Tex. Tech. L. Rev. 419 (1979); M. S. Kinney, *Medical Malpractice Statute of Limitations as Special Legislation*, 55 Chi.-Kent L. Rev. 519 (1979). Aunque muchos comentaristas opinan que la existencia de la crisis fue grandemente exagerada y respondía a un interés de las compañías de seguros por aumentar las primas del seguro por impericia médica, [6] lo cierto es que entre 1975 y 1977 cuarenta y nueve estados aprobaron legislación para aliviar la alegada crisis. Witherspoon, *op. cit.*,

---

[6] W. A. Aitken, *Medical Malpractice: The Alleged "Crisis" in Perspective*, 637 Ins. L.J. 90, 96 (1976); B. A. Oster, *Medical Malpractice Insurance*, 45 Ins. Counsel J. 228 (1978); H. A. Learner, *Restrictive Medical Malpractice Compensation Schemes*, 18 Harv. J. on Legis. 143 (1981); D. Louisell y H. Williams, *Medical Malpractice*, California, Matthew Bender Co., Inc., 1986, T. 2, Sec. 20-07. El Informe Anual de la Administración del Fondo de Compensación al Paciente para el año fiscal 1976–77 nos dice:

"En retrospección, sin embargo, hay que concluir que Puerto Rico nunca ha sido afectado por todos los elementos constitutivos de una verdadera crisis en la suscripción del seguro de responsabilidad profesional para médicos y hospitales. Lo que sí existió fue un pánico momentáneo motivado conjuntamente por el cierre parcial en la disponibilidad de este seguro y por el encarecimiento de su costo, según antes se ha descrito."

pág. 419. Nuestra Legislatura respondió. Aprobó la Ley Núm. 74 de 30 de mayo de 1976, subsiguientemente enmendada por la Ley Núm. 55 de 18 de julio de 1978 (26 L.P.R.A. sec. 4101 y ss.). La misma fue creada para "enfrentarse al 'problema de encarecimiento, escasez y pérdida' del seguro de responsabilidad profesional para médicos e instituciones hospitalarias, y por tanto a los 'aumentos en los costos de los servicios de salud y serias limitaciones al ejercicio cabal y pleno de la medicina', lo que tenía consecuencias 'para la salud, el bienestar y la estabilidad del pueblo en general' ". *Vázquez Negrón* v. *E.L.A.*, 109 D.P.R. 19, 21 (1979) ; Exposición de Motivos, Ley Núm. 55 de 18 de julio de 1978. En el Informe de la Comisión de Hacienda de 25 de abril de 1976 para la Ley Núm. 74 se expone que:

> Esta medida tiene como propósito enmendar el Código de Seguros de Puerto Rico, a los efectos de establecer un programa de seguros de responsabilidad profesional médica hospitalaria. La multiplicidad de pleitos judiciales donde se reclama indemnización por daños y perjuicios contra médicos y hospitales por razón de culpa o negligencia en la práctica profesional ha provocado un alza considerable en el costo del seguro de que para cubrir esa responsabilidad se provee a médicos y profesionales. La medida que ahora se informa va dirigida, entre otras cosas a reducir y a limitar el costo de seguro de responsabilidad para profesionales en el cuidado de la salud e instituciones dedicadas a ello. [7]

Las leyes creadas para resolver la alegada crisis tienen la intención de reducir y limitar grandemente la responsabilidad civil de los profesionales en el cuidado de la salud. Witherspoon, *op. cit.*, pág. 419; Kinney, *op. cit.*, pág. 519. En Puerto Rico uno de los mecanismos utilizados para lograrlo es

---

[7] Otras fuentes indican la posibilidad de que las alzas se deban también a la "inercia o apatía de algunos médicos que no quieren acogerse a un seguro de *malpractice*". Véanse los Informes Anuales de la Administración del Fondo de Compensación al Paciente para los años 1982–83, pág. 7; años 1983–84, pág. 7; años 1977–78, pág. 7.

el establecimiento de un plazo absoluto de dos años dentro del cual se debe llevar la acción. Así se evita que se lleve una acción después de transcurrido dicho término, aun si el daño es descubierto con posterioridad a su transcurso. *Rodríguez* v. *Barreto*, 113 D.P.R. 541, 545 (1982).

A modo de comparación veamos los plazos de los diferentes estados según su duración: *2 años:* Georgia (Ga. Code Ann., Secs. 3-1102, 3-1103), Indiana (Ind. Code Ann., Secs. 16-9.5-3-1, 16-9.5-3-2), Texas (Tex. Rev. Civ. Stat. Ann., Art. 4590), South Dakota (S.D. Comp. Laws Ann., Sec. 15-2-14.1); *2 años y 6 meses:* New York (N.Y. Civ. Prac. Law., Sec. 214a); *3 años:* Arizona (Ariz. Rev. Stat., Sec. 12-564), California (Cal. Civ. Proc. Code, Sec. 340.5), Delaware (Del. Code, Tit. 18, Sec. 6856), New Mexico (N.M. Stat. Ann., Sec. 41-5-13), Oklahoma (Okla. Stat. Ann., Tit. 76, Sec. 18), Tennessee (Tenn. Code Ann., Sec. 23-3415), Colorado (Colo. Rev. Stat., Sec. 13-80-105), Connecticut (Conn. Gen. Stat. Ann., Sec. 52-584), Lousiana (La. Rev. Stat. Ann., Art. 9:5628); *4 años:* Alabama (Ala. Code, 6-5-480), Kansas (Kan. Civ. Proc. Stat. Ann., Sec. 60-513), Nevada (Nev. Rev. Stat., Sec. 41A. 097), Ohio (Ohio Rev. Code Ann., Sec. 2305.11), North Carolina (N.C. Gen. Stat., Sec. 1-15); *5 años:* Maryland (Md. Cts. and Jud. Proc. Code Ann., Sec. 5-109), Oregon (Or. Rev. Stat., Sec. 12.110), Montana (Mont. Rev. Codes Ann., Sec. 93-2624), Kentucky (Ky. Rev. Stat. Ann., Sec. 413.140); *6* años: South Carolina (S.C. Code, Sec. 15-3-545), Hawaii (Haw. Rev. Stat., Sec. 657-7.3), Iowa (Iowa Code Ann., Sec. 614.1), North Dakota (N. D. Cent. Code, Sec. 28-01-18); *7 años:* Florida (Fla. Stat. Ann. Sec. 95.11), Vermont (Vt. Stat. Ann., Tit. 12, Sec. 521); *8 años:* New Hampshire (N.H. Rev. Stat. Ann., Sec. 507-c:4), Washington (Wash. Rev. Code Ann., Sec. 4.16-350); *10 años:* Missouri (Mo. Ann. Stat., Sec. 516-105), Nebraska (Neb. Rev. Stat., Sec. 25-222), Utah (Utah Code Ann., Sec. 78-12-28). Finalmente, el estatuto de Michigan establece un término

prescriptivo de 2 años computados a partir del momento en que finalice el tratamiento del médico demandado. (Mich. Comp. Laws Ann., Sec. 600.5838.)

■ La razón de ser de los estatutos de prescripción fue delineada por este Tribunal en *Colón Prieto* v. *Géigel*, 115 D.P.R. 232, 243 (1984), en los siguientes términos:

> La institución de la prescripción extintiva aspira a asegurar la estabilidad de la propiedad y la certidumbre de los demás derechos. *Agulló* v. *ASERCO*, 104 D.P.R. 224, 248 (1975). Su innegable necesidad y valor responden a "una presunción legal de abandono, derivada del hecho del transcurso de un tiempo determinado sin reclamar un derecho". *Eisele* v. *Orcasitas*, 85 D.P.R. 89, 93 (1962). *Sin embargo, ninguno de los intereses a los cuales responde es absoluto —de un lado salvaguardar un derecho y del otro, darle carácter definido a la incertidumbre de una posible reclamación— sino que deben ser aquilatados en su justa proyección.* (Énfasis suplido.)

■ En *Ortiz* v. *Municipio de Orocovis*, supra, págs. 487–488, dijimos "que el fundamento de prescripción debe concebirse objetivamente, pues por ella 'se asegura la estabilidad de la propiedad y la certidumbre de los demás derechos. La economía y la vida jurídica sufrirían grave quebranto si el estado de hecho, representado por el ejercicio o no ejercicio de un derecho, no viniere a convertirse por el transcurso del tiempo en un estado de derecho inatacable' ". Véanse, además, *González* v. *Pérez*, 57 D.P.R. 860 (1941); *Cruz* v. *González*, 66 D.P.R. 212 (1946); *Sánchez* v. *Cooperativa Azucarera*, 66 D.P.R. 346 (1946). El establecimiento de estatutos de prescripción es un asunto de política pública de los estados y su determinación recae exclusivamente en la Legislatura. *Anderson* v. *Wagner*, 402 N.E.2d 560, 567 (1980); *Kenyon* v. *Hammer*, 688 P.2d 961, 971 (Ariz. 1984); *Martínez* v. *California*, 444 U.S. 277, 282 (1980); *Owen* v. *Wilson*, 537 S.W.2d 543, 545 (1976); *Logan* v. *Zimmerman Brush Co.*,

455 U.S. 422, 434 n. 7 (1982); *Rohrabaugh* v. *Wagoner*, 413 N.E.2d 891 (Ind. 1980); *Short* v. *Texaco, Inc.*, 406 N.E.2d 625 (Ind. 1980). El Estado tiene amplia discreción para limitar el tiempo en el que se puede interponer una reclamación. *Stephens* v. *Snyder Clinic Ass'n*, 631 P.2d 222, 234 (1981); *Elam* v. *Bruenger*, 193 P.2d 225 (1948); M. Firestone, *Prescription—What You Don't Know Can Hurt You*, 58 Tul. L. Rev. 1547, 1549 (1984). Dicha acción legislativa tiene una presunción de validez. *Hermina González* v. *Srio. del Trabajo*, 107 D.P.R. 667, 674 (1978); *Sak* v. *Votteler*, 648 S.W.2d 661, 664 (1983); *Smith* v. *Davis*, 426 S.W.2d 827, 831 (1968).

Sin embargo, dada la importancia del derecho aquí expuesto, no debemos incurrir en el error judicial previsto por R. Lockaby en su artículo *Constitutional Challenges to Medical Malpractice Review Boards*, 46 Tenn. L. Rev. 607, 645 (1979):

> State courts that have swept aside the equal protection argument have seriously shirked their judicial responsibilities. Proper scrutiny of the constitutional validity of state legislation demands more than a perfunctory deferral to the legislature's conclusions regarding the existence of a health care crisis in the particular state. The courts also discredit themselves in their analysis of constitutional issues, especially the issue of equal protection, when they so characteristically state at the beginning of their opinions that "the constitutionality of state legislation must be presumed" or that "courts should be hesitant in their rejection of state legislation on constitutional grounds".

Distinto al caso de *Rodríguez* v. *Barreto*, supra, donde no se entró a considerar la constitucionalidad de la ley por no ser esa la pregunta certificada, en los recursos ante nuestra consideración se ataca expresamente la constitucionalidad de la Sec. 4109 del Código de Seguros. Por contener éstos un asunto constitucional sustancial, ejercitamos nuestra jurisdicción apelativa. *P.S.P., P.P.D., P.I.P.* v. *Romero Barceló*, 110

D.P.R. 248, 255 (1980) ; *Soltero Peralta* v. *Srio. de Hacienda*, 86 D.P.R. 26, 28 (1962) ; *Ortiz* v. *Burgos*, 85 D.P.R. 42, 44–45 (1962).

## II

Se alega que la Sec. 4109 es inconstitucional porque viola a los recipientes del daño su derecho a la igual protección de las leyes y al debido proceso de ley, consagrados en el Art. II, Sec. 7 de la Constitución del Estado Libre Asociado de Puerto Rico, ya que en estos casos la citada sección tiene el efecto de privar a los demandantes de su causa de acción antes de saber que la tenían. ([8])

La igual protección de las leyes no exige un trato igual para todos los ciudadanos. *Zachry International* v. *Tribunal Superior*, 104 D.P.R. 267, 277 (1975) ; *Pueblo* v. *Matías Castro*, 90 D.P.R. 528, 531 (1964). El Estado tiene la facultad de establecer clasificaciones. La existencia de una clasificación no implica per se que ha habido una violación a dicha cláusula constitucional. *P.S.P., P.P.D., P.I.P.* v. *Romero Barceló*, supra, pág. 260. Aunque no se exige una perfección de la Legislatura al establecer una clasificación, *Hermina González* v. *Srio. del Trabajo*, supra, se prohíbe el establecimiento de un trato desigual injustificado. *Zachry International* v. *Tribunal Superior*, supra, pág. 277.

Para la determinación de la razonabilidad de una clasificación legislativa ante un ataque constitucional de igual protección, se han establecido tres escrutinios o criterios: (a) el escrutinio estricto, (b) el escrutinio intermedio y (c) el escrutinio tradicional, también conocido como el escrutinio del nexo racional o escrutinio deferencial. *Vélez* v. *Srio. de*

---

([8]) Véanse: *Austin* v. *Litvak*, 682 P.2d 41, 51 (Colo. 1984) ; *Kenyon* v. *Hammer*, 688 P.2d 961, 978 (Ariz. 1984) ; *Carson* v. *Maurer*, 424 A.2d 825, 833 (N.H. 1980) ; *Brown* v. *Mary Hitchcock Memorial Hosp.*, 378 A.2d 1138 (1977) ; M. Firestone, *Prescription—What You Don't Know Can Hurt You*, 58 Tul. L. Rev. 1547 (1984).

*Justicia,* 115 D.P.R. 533 (1984); *Marina Ind., Inc.* v. *Brown Boveri Corp.,* 114 D.P.R. 64 (1983); *León Rosario* v. *Torres,* 109 D.P.R. 804 (1980); *Zachry International* v. *Tribunal Superior,* supra.

El escrutinio intermedio es activado cuando la clasificación legislativa afecta "intereses individuales importantes, aunque no necesariamente fundamentales, y el uso de criterios sensitivos de clasificación, aunque no sean necesariamente sospechosos". *León Rosario* v. *Torres,* supra, pág. 814. Dicho escrutinio es "más riguroso que el criterio tradicional mínimo pero menos que el del escrutinio estricto". *Hermina González* v. *Srio. del Trabajo,* supra, pág. 679. Bajo este escrutinio, para resistir el ataque constitucional la clasificación legislativa debe servir objetivos gubernamentales importantes y estar sustancialmente relacionada a la consecución de dichos objetivos. *Reed* v. *Reed,* 404 U.S. 71, 75 (1971); *Craig* v. *Boren,* 429 U.S. 190, 197 (1976). Sin embargo, dicho escrutinio no lo hemos utilizado. *Vélez* v. *Srio. de Justicia,* supra, esc. 2.

Bajo el escrutinio deferencial o racional, las clasificaciones no se declaran inválidas a menos que no exista un interés legítimo del Estado en la clasificación cuestionada o que no pueda establecerse un nexo racional entre la clasificación y el interés estatal. *Hermina González* v. *Srio. del Trabajo,* supra, pág. 673. Bajo éste, si puede concebirse cualquier situación de hechos que justifique la clasificación, la misma debe declararse válida. El peso de la prueba para demostrar que no hay un interés legítimo del Estado o no hay nexo racional recae sobre la parte que cuestiona su validez. *Zachry International* v. *Tribunal Superior,* supra; *Vélez* v. *Srio. de Justicia,* supra. Dicho criterio es generalmente utilizado para determinar la constitucionalidad de la legislación de naturaleza económica-social. *Marina Ind., Inc.* v. *Brown Boveri Corp.,* supra; *Vélez* v. *Srio. de Justicia,* supra; *Vda. de Miranda* v. *Srio. de Hacienda,* 114 D.P.R. 11 (1983).

El escrutinio estricto le exige "al estado demostrar la existencia de un interés público apremiante o de superior jerarquía (*compelling state interest*) que justifique la clasificación y que la misma promueva necesariamente la consecución de ese interés". *Zachry International* v. *Tribunal Superior*, supra, págs. 277–278. Dicho escrutinio será aplicado cuando la clasificación afecte derechos fundamentales o sea inherentemente sospechosa.

El estatuto impugnado permite llevar una acción por impericia médica "dentro de un año desde el momento en que el daño fue descubierto o debió haber sido descubierto con la debida diligencia". Dicha norma (*discovery rule*) está basada en la injusticia manifiesta que representa eliminar la causa de acción de una persona recipiente de un daño antes de que tenga una oportunidad razonable de descubrir su existencia. *Austin* v. *Litvak*, 682 P.2d 41, 51 (Colo. 1984); *Brown* v. *Mary Hitchcock Memorial Hosp.*, 378 A.2d 1138, 1139–1140 (1977); *Frohs* v. *Greene*, 452 P.2d 564, 565 (Or. 1969). Sin embargo, la disposición cuestionada también incluye un plazo absoluto, por el cual "en ningún caso se podrá iniciar la acción más tarde de dos años". En *Rodríguez* v. *Barreto*, supra, resolvimos que dicho periodo se computa desde la fecha en que ocurrió el daño y no desde que lo supo o debió saberlo la parte agraviada. Por tanto, si una persona descubre la existencia del daño luego de transcurrido dicho término, su acción habrá prescrito antes de éste conocer su existencia. Esta clasificación distingue entre demandantes con lesiones latentes y los que tienen el beneficio de descubrirlo antes de que transcurran los dos años. *Jewson* v. *Mayo Clinic*, 691 F.2d 405, 411 (1982); *Shessel* v. *Stroup*, 316 S.E.2d 155 (1984); *Carson* v. *Maurer*, supra; *Heath* v. *Sears, Roebuck & Co.*, 464 A.2d 288, 295 (N.H. 1983). Establecida la existencia de la clasificación, analicemos cuál es el escrutinio aplicable al estatuto en cuestión.

En Estados Unidos, los tribunales estatales han utilizado los tres escrutinios al analizar estatutos de prescripción para casos de impericia médica, dependiendo si éstas consideran al derecho de acceso a los tribunales o a la reparación de agravios como un derecho fundamental. La mayoría de ellos ha sostenido la constitucionalidad de los estatutos utilizando el análisis tradicional. Examínense, entre otros: *Anderson* v. *Wagner*, supra, que resuelve que existe una base razonable para la clasificación y guarda una relación razonable y propia para los propósitos de la ley; *Jewson* v. *Mayo Clinic*, supra, donde se dice que el estatuto no es totalmente irrelevante al objetivo del estatuto y que la clasificación está lo suficientemente relacionada con ello para no hacerlo irracional; *Rohrbaugh* v. *Wagoner*, supra, que sostiene que el estatuto no inflige un derecho fundamental ni afecta una clase sospechosa; *Chaffin* v. *Nicosia*, 310 N.E.2d 867 (1974), donde se dictamina que el estatuto no es inconstitucional per se por existir una base razonable para la clasificación; *Ross* v. *Kansas City Gen. Hosp. & Medical Ctr.*, 608 S.W.2d 397 (1980), que sostiene la validez del estatuto porque no está falto de una base razonable ni hay distinción alguna entre los miembros de cada clase. Véanse, además, *Duffy* v. *King Chiropractic Clinic*, 565 P.2d 435 (1977); *Landgraff* v. *Wagner*, 546 P.2d 26 (1976); *Dunn* v. *St. Francis Hosp., Inc.*, 401 A.2d 77 (1979); *McCarty* v. *Goldstein*, 376 P.2d 691 (1962). Otros tribunales han declarado inconstitucional un estatuto como el presente al determinar que ni siquiera resiste el escrutinio tradicional. *Austin* v. *Litvak*, supra; *Shessel* v. *Stroup*, supra; *Clark* v. *Singer*, 298 S.E.2d 484 (1983). También se ha aplicado el escrutinio intermedio, se determinó que estaba envuelto un derecho sustantivo importante y requirió un escrutinio más riguroso que el racional. *Carson* v. *Maurer*, 424 A.2d 825 (N.H. 1980). Véanse, además, *Jones* v. *State Board of Medicine*, 555 P.2d 399, 411 (1976); *Arneson* v. *Olson*, 270 N.W.2d 125, 133 (1978); *Johnson* v. *St. Vincent Hospital*,

*Inc.*, 404 N.E.2d 585 (1980). Finalmente, algunas jurisdicciones le han aplicado el escrutinio estricto a legislaciones como la presente por entender que el derecho envuelto es de naturaleza fundamental. *Kenyon* v. *Hammer*, supra; *Nelson* v. *Krusen*, 678 S.W.2d 918 (Tex. 1984); *Barrio* v. *San Manuel Div. Hosp.*, *Magna Copper*, 692 P.2d 280 (Ariz. 1984).

Este Tribunal ha resuelto que el derecho a llevar una acción civil es un derecho fundamental y cualquier clasificación legislativa que afecte este derecho tendrá que resistir el análisis de estricto escrutinio judicial. *Torres* v. *Castillo Alicea*, 111 D.P.R. 792, 801–802 (1981). Allí se dijo, citando con aprobación al profesor Tribe, lo siguiente:

> Las clasificaciones legislativas y administrativas deben someterse a escrutinio estricto y su inconstitucionalidad decretarse en ausencia de justificación gubernamental apremiante, si distribuyen beneficios o cargas de modo inconsistente con derechos fundamentales. A los fines de análisis de la igual protección, las clasificaciones pueden crear inequidades con impacto sobre derechos fundamentales, de dos maneras:

> Primero, desigualdad respecto a una libertad, propiedad, u otro interés, como el interés en obtener un decreto judicial de divorcio, o en recibir beneficios de bienestar público, pueden estructurarse de tal modo que impida o penalice el ejercicio de un derecho que está independientemente protegido contra intervención gubernamental. . . . Segundo, y más intrínseco al concepto de igual protección, la desigualdad podrá menoscabar directamente el acceso a, o los niveles de un derecho considerado fundamental en el sentido específico de que desviaciones de la igualdad en su disponibilidad o disfrute son sospechosas. Estas desigualdades son particularmente lesivas cuando intervienen con cualquiera de las dos mayores fuentes de legitimidad política y legal, a saber, la franquicia electoral y la *acción civil*, o con el ejercicio de opciones personales de intimidad. (Traducción y énfasis en el original.)

Anterior a ello, habíamos expresado que las condiciones limitativas del derecho de las personas a solicitar reparación debe interpretarse restrictivamente. *Vázquez Negrón* v. *E.L.A.*, supra, pág. 25; *Insurance Co. of P. R.* v. *Ruiz*, 96 D.P.R. 175, 179 (1968). Es al Estado a quien le corresponde el peso de la prueba para demostrar la existencia de un interés estatal apremiante, que la clasificación legislativa promueve necesariamente dicho interés y que no existen medidas menos drásticas para alcanzar dicho fin. No lo ha hecho. Han intentado sostener la constitucionalidad del estatuto utilizando el análisis tradicional. [9]

El propósito primordial del estatuto en consideración es "reducir y limitar el costo del seguro de responsabilidad para profesionales en el cuidado de la salud". Véase el Informe de la Comisión de Hacienda de 25 de abril de 1976. El Informe Conjunto de la Comisión de lo Jurídico Civil para la Ley Núm. 74, expresa lo siguiente:

Alcance de la medida: El propósito de esta medida es establecer los mecanismos para asegurar la disponibilidad de un seguro de responsabilidad profesional médica e instituciones hospitalarias. [10]

La exposición de motivos de la Ley Núm. 55, *supra*, explica los motivos de la ley ante nuestra consideración:

---

[9] Aparentemente guiados por la utilización de dicho análisis por este Tribunal en *Vázquez Negrón* v. *E.L.A.*, 109 D.P.R. 19, 25 (1979) y *Lind Rodríguez* v. *E.L.A.*, 112 D.P.R. 67, 68 (1982). Sin embargo, la clasificación en controversia en *Vázquez Negrón* v. *E.L.A.*, supra, era sustancialmente diferente, ya que diferenciaba entre médicos que laboran exclusivamente para el Estado y médicos particulares; no estaba allí envuelto un derecho fundamental del reclamante.

[10] Aparentemente dicho objetivo fue logrado rápidamente, ya que varios informes de la Administración del Fondo de Compensación al Paciente indican que la disponibilidad del seguro por impericia médica estaba asegurada. Véanse: Informe anual 1981–82, pág. 1; Informe 1980–81, pág. 9; Informe 1978–79, pág. 8. El plazo absoluto de dos años es uno de los mecanismos creados para lograr este fin.

La Ley núm. 74 de 30 de mayo de 1976 adicionó el Capítulo 41 a la Ley núm. 77 de 19 de junio de 1957, según enmendada, conocida como Código de Seguros de Puerto Rico, *con el fin de establecer los mecanismos necesarios para asegurar la disponibilidad de un seguro de responsabilidad profesional para médicos e instituciones hospitalarias. La medida fue adoptada en atención al problema de encarecimiento, escasez y pérdida del referido seguro que habían estado confrontando los médicos e instituciones hospitalarias en Puerto Rico* y que trajo, como consecuencia, aumentos en los costos de los servicios de salud y serias limitaciones al ejercicio cabal y pleno de la medicina. Se pretendió, por tanto, prevenir y controlar un problema que acarreaba efectos adversos para la salud, el bienestar y la estabilidad del pueblo en general.

Durante el tiempo transcurrido desde la aprobación de la Ley núm. 74 hasta el presente, la situación que se intentó controlar se ha tornado aun más crítica, ya que *en la actualidad sólo dos compañías de seguros están vendiendo la referida póliza de responsabilidad profesional. Las primas a pagarse han continuado en aumento* y los términos bajo los cuales se expide dicha póliza ofrecen muy poca protección a los profesionales e instituciones de salud. Por razón de que con la Ley núm. 74 se exigió a los profesionales e instituciones de salud en Puerto Rico adquirir y mantener una póliza de responsabilidad profesional o evidenciar responsabilidad financiera hasta unos límites fijados en la misma ley, *los altos costos de la póliza se han constituido en una barrera económica que limita seriamente el ejercicio privado de la medicina....*(11) (Énfasis suplido.)

_____

(11) En cuanto al encarecimiento de las pólizas de seguro, las medidas adoptadas aparentemente han resultado infructuosas para aliviar el problema. Ello se demuestra con el hecho de que la Oficina del Comisionado de Seguros de Puerto Rico autorizó un aumento global de 7.3% en el nivel de tipos de primas correspondientes el 24 de junio de 1985, el cual se hizo efectivo a partir del 30 de junio de 1985. Este aumento global cubre un ámbito desde un 41.4% de aumento autorizado para el seguro de los endocrinólogos hasta un 108.4% de aumento autorizado para los pediatras que practican cirugía menor.

Una de las medidas encaminadas a lograr tal fin fue el establecimiento de términos de prescripción específicos para reclamaciones por impericia médica "independientemente de lo dispuesto en otra ley". Resolvemos que dicho interés no puede catalogarse como apremiante.[12] Como se dijo en *Kenyon* v. *Hammer*, supra, pág. 976:

> The act under consideration abolishes the discovery rule for many types of claims against health care providers, no matter how meritorious the claim. It is difficult to find a compelling or even legitimate interest in this. It may be argued, of course, that the high premiums in malpractice cases work an economic hardship on physicians and that, therefore, the special statute of limitations should be sustained as a necessary "relief measure" for health care providers. We doubt the factual premise for such an argument. More importantly, however, we believe that the state has neither a compelling nor legitimate interest in providing economic relief to one segment of society by depriving those who have been wronged of access to, and remedy by, the judicial system. If such a hypothesis were once approved, any profession, business or industry experiencing difficulty could be made the beneficiary of special legislation designed to ameliorate its economic adversity by limiting access to courts by those whom they have damaged. Under such a system, our constitutional guarantees would be gradually eroded, until this state became no more than a playground for the privileged and influential. We believe this is exactly what those guarantees were designed to prevent.[13]

---

[12] El Procurador General sostiene que el propósito del estatuto es "el bienestar y la estabilidad del pueblo en general" como menciona la Exposición de Motivos. Sin embargo, las citas transcritas demuestran que el motivo primordial es el expresado, ya que los costos del cuidado de salud suben *como consecuencia* de los seguros, como expresa la propia Exposición. El efecto práctico de la legislación es beneficiar a los profesionales en el cuidado de la salud, las instituciones para el cuidado de la salud y las compañías aseguradoras.

[13] En *Torres* v. *Castillo Alicea*, 111 D.P.R. 792, 801 (1981), expresamos que "no es forzoso concluir 'que un precepto que viole una prohibición constitucional sea constitucional meramente porque el motivo de la Legisla-

Aun si fuera un interés apremiante, el Estado tendría que demostrar que la clasificación promueve "necesariamente" dicho interés. El caso de *Kenyon* v. *Hammer*, supra, pág. 977, se enfrenta también a este punto:

> The question then is whether the abolition of the discovery rule is necessary to reduce malpractice premiums. It has been held that shortening the statute of limitations to the extent that claims are barred before they can reasonably be brought is neither rationally nor substantially related to such a goal and is so unreasonable and arbitrary that it violates the equal protection provisions of various state constitutions. *Schwan* v. *Riverside Methodist Hospital*, 6 Ohio St. 3d 300, 301–02, 452 N.E.2d 1337, 1339 (1983) (holding that even though the right to bring an action is not "fundamental" under the Ohio Constitution, the statute's internal classifications between minors above and below the age of ten were not rationally related to a legitimate legislative objective and thus violated equal protection); *cf.* subsections (B), (C) and (D), of A.R.S. sec. 12–564; *Clark* v. *Singer*, 250 Ga. 470, 472, 298 SE.2d 484, 486 (1983) (finding "no rational basis for a limitation scheme which permits a medical malpractice wrongful death action if the patient dies within two years of the defendant's negligent act but which bars [it] if the patient lives for two years [and then dies] . . . where the defendant is a doctor but not in other wrongful death cases"); *Tafoya* v. *Doe*, 100 N.M. 328, 670 P.2d 582, 585 (App. 1983) (treating a notice statute for claims against the state as a statute of limitations and holding that equal protection was violated when the notice statute was applied to minors who could not reasonably be expected to file notice of injury within one hundred and twenty days).

Al no encontrar que el estatuto persigue un interés estatal apremiante y, si lo hubiese, que la clasificación es necesa-

tura sea laudable, o porque la ley fuera de naturaleza general y uniforme en su aplicación o fuese adoptado como medida de economía para hacer frente a una situación inusitada. El objeto de una disposición constitucional es una cosa. Los medios a través de los cuales se logra ese objeto es otra' ". Véase *Durand* v. *Sancho Bonet, Tesorero,* 50 D.P.R. 940, 943 (1937).

ria para la consecución de dicho interés estatal, o que no hay medidas menos drásticas para lograrlo, procede que se declare inconstitucional el Art. 41.090 del Código de Seguros por violar el precepto constitucional de la igual protección de las leyes al establecer un plazo absoluto de dos años para iniciar la acción de daños.

## III

El otro ataque constitucional al artículo estriba en que se priva a los demandantes de su propiedad sin el debido proceso de ley. [14] Alegan que al eliminársele su causa de acción sin que haya nacido les priva de su propiedad y su derecho a solicitar la reparación de agravios (Art. II, Sec. 4, Constitución E.L.A.).

■ El análisis a utilizarse cuando se impugnan estatutos de prescripción por violar la cláusula del debido proceso de ley fue establecido a principios de siglo por el Tribunal Supremo de Estados Unidos en *Wilson* v. *Iseminger*, 185 U.S. 55, 62 (1902). Allí se dijo:

> It may be properly conceded that all statutes of limitation must proceed on the idea that the party has full opportunity afforded him to try his right in the courts. A statute could not bar the existing rights of claimants without affording this opportunity; if it should attempt to do so, it would not be a statute of limitations, but an unlawful attempt to extinguish rights arbitrarily, whatever might be the purport of its provisions.

---

[14] Sobre dicha cláusula constitucional apuntamos en *Amy* v. *Adm. Deporte Hípico*, 116 D.P.R. 414, 420 (1985):

"Después de todo, el debido proceso de ley, encarna la esencia de nuestro sistema de justicia. Su prédica compendia elevados principios y valores que reflejan nuestra vida en sociedad y el grado de civilización alcanzado. Es herencia de nuestros antepasados, fruto de nuestro esfuerzo colectivo y nuestra vocación democrática de pueblo."

■ La Legislatura puede regular las causas de acción por negligencia siempre y cuando se le permita un tiempo razonable dentro del cual el agraviado pueda traer la acción. *Barrio* v. *San Manuel*, supra. Si el estatuto opera inmediatamente para eliminar el remedio existente, o dentro de un período de tiempo tan corto que no le da a la parte perjudicada una oportunidad razonable para ejercitar la acción, el estatuto es inconstitucional. *Stephens* v. *Snyder Clinic Ass'n*, supra, pág. 233; *Sax* v. *Votteler*, 648 S.W.2d 661, 665 (Tex. 1983); *Opalko* v. *Marymount Hosp., Inc.*, 458 N.E.2d 847, 849 (Ohio 1984); *Ross* v. *Kansas City*, 608 S.W.2d 397, 400 (1980); *Laughlin* v. *Forgrave*, 432 S.W.2d 308, 314 (1968). Una regulación que elimina la causa de acción antes de que ésta pueda interponerse legítimamente constituye una abrogación de dicho derecho. *Kenyon* v. *Hammer*, supra, pág. 966; *Barrio* v. *San Manuel*, supra, pág. 283; *Sax* v. *Votteler*, supra, pág. 666; *Saylor* v. *Hall*, 497 S.W.2d 218 (1973); *Kennedy* v. *Cumberland Engineering Co., Inc.*, 471 A.2d 195, 198 (R.I. 1984).

La opinión y resolución del Tribunal Superior de Bayamón que declara inconstitucional el estatuto, citando al informe anual para el año fiscal 1976–77 de la Administración del Fondo de Compensación al Paciente, describe el efecto del término prescriptivo sobre las acciones por impericia médica:

Es de rigor destacar que de dicho informe surgen las siguientes estadísticas que se utilizan para justificar la reducción de los términos de prescripción, en ánimo de abaratar el costo del seguro: "Según estadísticas recopiladas por el Har[t]ford Insurance Company aproximadamente sólo el 15% de todas las reclamaciones que finalmente se le cargaran a una póliza, se conocerán desde el primer año. Otro 30% se identificará en el segundo año y otro 30% en el tercer año. El restante 25% no se conocerá hasta los años subsiguientes." Estas estadísticas permiten concluir que al limitar a dos años las reclamaciones médicas hospitalarias quedan fuera de la posibilidad de establecer una reclamación alrededor del

55% de las personas que sufren daños como consecuencia del acto negligente de un médico. *Exhibit* IX, pág. 63.

■■■ El término prescriptivo del Art. 41.090 del Código de Seguros, en su plazo absoluto, puede tener el efecto de exigirle a los demandantes cumplir con lo imposible: demandar antes de que tengan conocimiento de su causa de acción. *Nelson* v. *Krusen*, supra, pág. 923.([15]) La inconstitucionalidad del estatuto en dichos términos estriba en que trata a todos los daños en forma igual. Sin embargo, hemos resuelto que no todos los daños son iguales. En *Rivera Encarnación* v. *E.L.A.*, 113 D.P.R. 383, 386 (1982), dijimos que:

> La dificultad reside en la variedad de circunstancias en que se da el problema del conocimiento del daño. Hechos distintos requieren soluciones diversas. Entre las diversas categorías de hechos se hallan la de los daños sucesivos o continuados; la de los daños instantáneos y permanentes; *la del daño cuya extensión o cuantía no se manifiesta de inmediato; la del daño embrionario o latente, no identificable hasta el transcurso de determinado tiempo;* la del daño que se oculta dolosamente por el autor; la de los daños múltiples, algunos de los cuales no son descubribles hasta más tarde; *y la del daño desconocido, que no viene a detectarse hasta tiempo después del acto culposo.* (Énfasis suplido.) ([16])

---

([15])Varios autores han criticado lo injusto que resulta eliminar una causa de acción al comenzar a correr el término prescriptivo antes de que el agraviado sepa siquiera de su existencia. Véanse: S. Sacks, *Statutes of Limitations and Undiscovered Malpractice*, 16 Clev.-Mar. L. Rev. 65 (1967); T. Lambert y P. Rheingold, *Comments on Recent Important Personal Injury (Tort) Cases*, 28 NACCA L.J. 63, 158 (1961); K. Webb, *Recent Medical Malpractice Legislation—A First Checkup*, 50 Tul. L. Rev. 655, 673–674 (1976).

([16])"También apunta hacia la posible inconstitucionalidad de la aludida cláusula de dos años *la situación de daños embrionarios, esto es, aquellos que no se manifiestan en forma reconocible hasta transcurrido un periodo mayor de años, en cuyo caso la acción para su indemnización estaría prescrita al conocerse el daño.* A nuestro juicio esto podría conllevar, el privar de un derecho sin el debido proceso de ley." (Énfasis nuestro.) H. Brau Del Toro, *Los daños y perjuicios extracontractuales en Puerto Rico*, Pubs. J.T.S., Suplemento 1983, pág. 69.

Analizando la constitucionalidad de un estatuto similar al nuestro, donde también se establece un plazo absoluto de dos años, el Tribunal Supremo del estado de Texas en *Nelson* v. *Krusen*, supra, pág. 923, resuelve que:

> The limitation period of article 5.82, section 4, if applied as written, would require the Nelsons to do the impossible —to sue before they had any reason to know they should sue. Such a result is rightly described as "shocking" and is so absurd and so unjust that it ought not be possible. *Hays* v. *Hall*, 488 S.W.2d 412, 414 (Tex. 1972); *Gaddis* v. *Smith*, 417 S.W.2d 577, 580–581 (Tex. 1967). Deferring to the legislative imposition of such an unreasonable condition would amount to an abdication of our judicial duty to protect the rights guaranteed by the Texas Constitution, the source and limit of legislative as well as judicial power. This, we cannot do. We hold that article 5.82, section 4 of the Insurance Code is unconstitutional, under the open courts provision, to the extent it purports to cut off an injured person's right to sue before the person has a reasonable opportunity to discover the wrong and bring suit.

Resolvemos que el término prescriptivo también viola la cláusula constitucional del debido procedimiento de ley.

■ Por los fundamentos antes expuestos, *se resuelve que el texto de la última oración del inciso (1) del Art. 41.090 del Código de Seguros es inconstitucional por violar el Art. II, Sec. 7 de la Constitución de Puerto Rico. Se dictará sentencia que confirme la del Tribunal Superior, Sala de Bayamón, y que revoque la del Tribunal Superior, Sala de San Juan. Se devolverán los casos a sus respectivas salas de instancia para la continuación de los procedimientos a tenor con lo aquí resuelto.*

Los Jueces Asociados Señores Negrón García y Alonso Alonso se unen a la totalidad de la opinión y el Juez Asociado Señor Negrón García emitió también opinión concurrente. La Juez Asociada Señora Naveira de Rodón emitió opinión concurrente uniéndose a las partes I y III. El Juez Presidente

Señor Pons Núñez concurre en el resultado sin opinión. El Juez Asociado Señor Rebollo López emitió opinión disidente. El Juez Asociado Señor Hernández Denton no intervino.

—O—

Opinión concurrente emitida por el Juez Asociado Señor Negrón García.

Al suscribir el decreto de inconstitucionalidad sobre la Sec. 4109 del Código de Seguros, ratificamos nuestras expresiones vertidas en el disenso emitido en *Rodríguez* v. *Barreto*, 113 D.P.R. 541, 548 (1982). Desde entonces, allí reconocimos "la realidad y dinámica humanas de que médicamente habrá ocasiones en que el acto u omisión negligente genera un daño en forma simultánea o coetánea; y que, en otras, el daño sobreviene y se manifiesta con posterioridad. ¿Cómo entonces fijar un plazo absoluto de dos años a lo que constituye un curso impredecible y que oculta la propia naturaleza"?

—O—

Opinión concurrente emitida por la Juez Asociada Señora Naveira de Rodón.

Estamos conformes en el resultado y la parte III(¹) de la opinión mayoritaria en cuanto declara inconstitucional la úl-

---

(¹) No podemos suscribir la parte II de la misma. La opinión del tribunal basa su análisis de la igual protección de las leyes en *Torres* v. *Castillo Alicea*, 111 D.P.R. 792 (1981), en la medida en que resuelve "que el derecho a llevar una acción civil es un derecho fundamental y cualquier clasificación legislativa que afecte este derecho tendrá que resistir el análisis de estricto escrutinio judicial". Pág. 690. Entendemos que en *Castillo Alicea*, no se resolvió que existe un derecho constitucional fundamental, por sí solo, de acceso a los tribunales.

El derecho constitucional de acceso a los tribunales, como requisito del debido proceso de ley procesal, *Boddie* v. *Connecticut*, 401 U.S. 371 (1970), existe como garantía al "ejercicio de un derecho que está *independientemente protegido* contra intervención gubernamental" o cuando se crean desigualdades que menoscaban un "*derecho fundamental*". (Énfasis suplido.)

tima oración del Art. 41.090(1) del Código de Seguros, 26 L.P.R.A. sec. 4109(1). Sin embargo, entendemos que el referido artículo viola el debido proceso de ley procesal. (²)

## I

El debido proceso de ley, en su modalidad de garantizar una vista adecuada, dispone de la controversia ante nos. Como

---

*Torres* v. *Castillo Alicea,* supra, pág. 802; *Boddie,* supra. J. Nowak, R. Rotunda y J. Young, *Constitutional Law,* 2da ed., St. Paul, Minnesota, West Pub. Co., 1983, pág. 581.

En *Boddie* v. *Connecticut,* supra, págs. 382–383, el caso principal en la jurisdicción federal sobre acceso a los tribunales se enfatizó: "We do not decide that access for all individuals to the courts is a right that is, in all circumstances, guaranteed by the Due Process Clause of the Fourteenth Amendment so that its exercise may not be placed beyond the reach of any individual, for, as we have already noted, in the case before us *this right is the exclusive precondition to the adjustment of a fundamental human relationship.* The requirement that these appellants resort to the judicial process is entirely a state-created matter." (Énfasis nuestro.) En *Boddie* v. *Connecticut,* supra, se trataba del derecho de acceso de una clase indigente al tribunal para reclamar su divorcio.

También véase el escolio 5 en *Logan* v. *Zimmerman Brush Co.,* 455 U.S. 422, 430 (1982). En *Logan* se declaró inconstitucional, por violar el debido proceso de ley procesal, un esquema legislativo que privaba al reclamante de su causa de acción por despido injustificado debido a su incapacidad física, cuando el comisionado de una agencia administrativa no celebraba una vista dentro de 120 días. En ese escolio se explica el alcance de la doctrina de acceso a los tribunales; también se indica que probablemente se podría llegar a igual resultado en el caso a base de esa doctrina, sin embargo, el tribunal resolvió sólo a base de la violación al debido proceso de ley. Se abstuvo de resolver a base de igual protección de las leyes y de acceso al tribunal.

La Opinión del Tribunal, pág. 690, expresa que algunas jurisdicciones estatales han reconocido el derecho de acceso a los tribunales como uno de naturaleza fundamental, y por tanto usan un escrutinio estricto para propósitos de la impugnación de igual protección de las leyes. Se cita a *Kenyon* v. *Hammer,* 688 P.2d 961 (Ariz. 1984); *Nelson* v. *Krusen,* 678 S.W.2d 918 (Tex. 1984), y *Barrio* v. *San Manuel Div. Hosp., Magma Copper,* 692 P.2d 280 (Ariz. 1984). El resultado, en esas jurisdicciones —Texas y Arizona— es inescapable, pues, distinto a Puerto Rico, en la constitución de estos estados se reconoce expresamente el derecho de llevar causas de acción por daños y perjuicios. Véanse los casos antes citados.

(²)La referencia a la jurisprudencia federal es sólo para fines comparativos. Estamos resolviendo a base del Art. II, Sec. 7 de la Constitución del Estado Libre Asociado de Puerto Rico.

en todo caso de debido proceso de ley procesal debemos enfrentarnos a dos interrogantes: (1) ¿Existe un interés de libertad o de propiedad que sea menoscabado por la acción impugnada?; (2) si alguno de esos intereses es menoscabado, ¿cuál procedimiento es el debido? *Román* v. *Trib. Exam. de Médicos,* 116 D.P.R. 71 (1985); *Cleveland Bd. of Ed.* v. *Loudermill,* 470 U.S. 532 (1985); *Logan* v. *Zimmerman Brush Co.,* 455 U.S. 422, 428–435 (1982); *Board of Regents* v. *Roth,* 408 U.S. 564 (1972).

Hemos resuelto que el derecho a llevar una demanda de daños y perjuicios, acción reconocida por la Asamblea Legislativa, es una forma de propiedad, —véanse *Vda. de Delgado* v. *Boston Ins. Co.,* 101 D.P.R. 598 (1973); *Publio Díaz* v. *E.L.A.,* 106 D.P.R. 854, 871–872 (1978)— y por lo tanto, está protegida por el debido proceso de ley. Art. II, Sec. VII, Const. E.L.A., L.P.R.A., Vol. 1. Véanse: *Logan* v. *Zimmerman Brush Co.,* supra, pág. 428 esc. 4; *Martínez* v. *California,* 444 U.S. 277, 281–282 (1980); *Mullane* v. *Central Hanover Tr. Co.,* 339 U.S. 306 (1950).

## II

El debido proceso de ley le garantiza a una parte agraviada una oportunidad de presentar su caso y que los méritos del mismo sean justamente adjudicados. Las garantías de notificación y audiencia adecuada dependerán de la naturaleza del caso y los intereses en competencia. *Román* v. *Trib. Exam. de Médicos,* supra; *Vélez Ramírez* v. *Romero Barceló,* 112 D.P.R. 716, 729 y ss. (1982); *Logan* v. *Zimmerman Brush Co.,* supra, pág. 433; *Boddie* v. *Connecticut,* supra, pág. 378; *Mullane* v. *Central Hanover Bank,* supra, pág. 313.([3])

---

([3]) Debemos recordar que el término absoluto de dos años es una limitación, aunque sustantiva, a la presentación de la causa de acción. Ese término no es un elemento de la causa de acción en sí; por lo tanto, corresponde el análisis procesal del debido proceso de ley y no el sustantivo. *Logan* v. *Zimmerman Brush Co.,* supra, pág. 433.

Para analizar la naturaleza de las garantías requeridas debemos examinar la importancia del interés privado protegido y la duración o finalidad de la privación, la posibilidad de error en la acción del Gobierno y la magnitud de los intereses del Gobierno que se adelantan con dicha acción. *Román v. Trib. Exam. de Médicos*, supra; *Vélez Ramírez v. Romero Barceló*, supra; *Cleveland Bd. of Ed.* v. *Loudermill*, supra; *Logan* v. *Zimmerman Brush Co.*, supra, pág. 434.

(a) La importancia para los ciudadanos de poder reclamar una compensación razonable por los daños que éstos puedan sufrir como consecuencia de acciones negligentes, independientemente del actor que genere esos daños, es incuestionable. No necesitamos abundar sobre este criterio. En estos casos la privación del derecho de propiedad, por operación de la ley impugnada, es definitiva, pues los demandantes por no conocer el daño antes del término fatal se ven privados de todo tipo de remedio.

(b) La posibilidad de error es muy grande. Fijar en dos años el término máximo para presentar una acción por impericia médica, sin importar desde cuándo la parte agraviada conoce el daño, permite que el 55% de los ciudadanos que sufren ese tipo de daño se queden sin remedio. Opinión del Tribunal, *ante*. [4] A diferencia de otras acciones, en los casos de impericia médica existe un esquema legislativo de limitación doble en cuanto al término para presentar esas causas de acción. Hay un término de prescripción que se combina arbitrariamente con el término absoluto de dos años. Ese esquema crea un riesgo muy grande para la ciudadanía en general. El

---

[4] La Regla 11(A)(2) y (B) de Evidencia, 32 L.P.R.A., Ap. IV, faculta al tribunal de instancia a tomar conocimiento judicial del Informe Anual 1976–77 de la Administración del Fondo de Compensación al Paciente. Recuérdese que el inciso (D) de esa regla permite tomar conocimiento judicial en la etapa apelativa. Los demandados y el Estado, parte interventora, no han derrotado la confiabilidad de ese informe.

término absoluto, al constituir una segunda limitación, es el que crea ese riesgo.

(c) Los intereses gubernamentales son importantes, pero en este caso ceden a los intereses antes discutidos. Reconocemos que el Estado tiene un interés muy importante en establecer períodos limitativos para presentar las acciones judiciales. *Colón Prieto* v. *Géigel,* 115 D.P.R. 232 (1984). En este caso, ese interés se protege debidamente con el término de prescripción de un año. El Gobierno también tiene gran interés en que todos los médicos y hospitales estén asegurados contra este tipo de acción, Opinión del Tribunal, *ante.* El otro interés adelantado también es importante, pues, es meritorio "reducir" y "limitar el costo de seguros de responsabilidad para profesionales en el cuido de la salud".[5] Sin embargo, ese propósito no puede afectar arbitrariamente la presentación de estas demandas.

Esto nos lleva a concluir que los demandantes tienen derecho a reclamar por los daños alegados, siempre que sea dentro del término prescriptivo de un año *luego de conocer el daño —Colón Prieto* v. *Géigel,* supra, pág. 246— sin el impedimento del término absoluto de dos años. Una decisión contraria llevaría consigo quitarle al 55% de las personas que sufren daños por impericia médica su causa de acción; privación que puede ocurrir antes de que éstos sepan que tienen el derecho de llevar esa causa de acción. Ese resultado es insostenible.[6]

---

[5] Alegadamente lo que causa el aumento en el costo de los seguros es la "multiplicidad de pleitos judiciales donde se reclama indemnización por daños y perjuicios contra médicos y hospitales". Informe de la Comisión de Hacienda del 25 de abril de 1976 para la Ley Núm. 74 de 30 de mayo de 1976, citado en la Opinión del Tribunal, *ante,* pág. 682.

[6] No compartimos la interpretación del Juez Asociado Hon. Francisco Rebollo López en cuanto al posible efecto de la opinión del Juez Asociado Hon. Peter Ortiz en su parte III sobre debido proceso de ley. La opinión del Juez Ortiz y la nuestra se expresan sobre el término de prescripción en casos de impericia médica y no tratan sobre otros términos de prescripción

Como se dijo en *Logan* v. *Zimmerman Brush Co.*, supra, pág. 437, "[o]bviously, nothing we have said entitles every civil litigant to a hearing on the merits in every case. The State may erect reasonable procedural requirements for triggering the right to an adjudication, [among them] statutes of limitations . . .". (7)

Por todo lo anterior estamos conformes con el decreto de inconstitucionalidad del Art. 41.090(1) del Código de Seguros, en su última oración, 26 L.P.R.A. sec. 4109(1).

—O—

Opinión disidente emitida por el Juez Asociado Señor Rebollo López.

La opinión mayoritaria que emite el Tribunal en el presente caso sostiene que la disposición del Art. 41.090(1) del Código de Seguros de Puerto Rico(1) que fija un término máximo de dos años para la iniciación de una acción por impericia médica hospitalaria infringe, de forma absoluta, las cláusulas constitucionales sobre igual protección de las leyes y debido proceso de ley.

Somos del criterio que la citada disposición estatutaria no lesiona la cláusula sobre igual protección de las leyes. Por otro lado, la determinación que se hace de que dicha disposi-

---

o de caducidad. Cualquier ataque a otros *términos* requerirá que las partes que impugnen o defiendan esos términos presenten *pruebas* sobre los criterios del debido proceso de ley procesal discutidos.

Tampoco entendemos que la opinión del Juez Asociado Hon. Peter Ortiz, leída en su totalidad, tiene el alcance señalado por el Juez Asociado Hon. Francisco Rebollo López; *cuando exista un derecho fundamental o una clasificación sospechosa se examinará la magnitud de los intereses del Estado conforme a la prueba que se presente.*

(7) Esta opinión no limita la facultad de la Asamblea Legislativa. Sólo resolvemos que la disposición de ley impugnada, a la luz de la prueba presentada, viola el debido proceso de ley procesal. La Asamblea Legislativa puede establecer otros términos que no lleven consigo una posibilidad de error tan grande como la del término aquí anulado.

(1) 26 L.P.R.A. sec. 4109(1).

ción infringe la cláusula sobre debido proceso de ley constituye en nuestra opinión —dicho con el mayor respeto— uno de los precedentes más peligrosos que jamás haya establecido este Tribunal; ello en vista de *los fundamentos* que se utilizan en apoyo de dicha determinación.

I

La opinión mayoritaria sostiene que la disposición en controversia del citado Art. 41.090 (1) infringe la cláusula sobre igual protección de las leyes por cuanto, en síntesis y en lo pertinente: (a) el estatuto establece una *clasificación* "entre demandantes con lesiones latentes y los que tienen el beneficio de descubrirlo antes de que transcurran los dos años"; (b) que como "el derecho a llevar una acción civil es un derecho fundamental", el criterio a ser aplicado lo es el de "estricto escrutinio judicial"; (c) razón por la cual le corresponde al Estado "el peso de la prueba para demostrar la existencia de un interés estatal apremiante", deber con el que no cumplió el Estado en el presente caso. Los dos primeros fundamentos —los cuales constituyen la base del razonamiento utilizado por el Tribunal— son claramente erróneos. Veamos:

La disposición estatutaria en controversia dispone, en lo pertinente, que:

(1) Los términos de prescripción contenidos en esta sección serán los únicos aplicables a las acciones de daños por culpa o negligencia (*malpractice*) que se inicien contra profesionales en el cuidado de salud e instituciones para el cuidado de salud.

La acción por alegados daños por culpa o negligencia (*malpractice*) comenzará, independientemente de lo dispuesto en otra ley, dentro de un año a partir de la fecha en que ocurrió el daño que dio lugar a la acción, o dentro de un año desde el momento en que el daño fue descubierto o debió haber sido descubierto con la debida diligencia. *En ningún caso se podrá iniciar la acción más tarde de dos años, desde*

*la fecha en que ocurrió el daño que dio lugar a la causa de acción.* (Énfasis suplido.)

Una lectura de la transcrita disposición demuestra que la misma —a diferencia de otras que han estado ante nuestra consideración en el pasado [2]— *no establece clasificación alguna como tal entre los posibles perjudicados por un acto de impericia médica (malpractice).* A lo sumo, lo que se podría decir es que el estatuto tiene la *consecuencia* de *afectar* la causa de acción que una persona pueda tener dependiendo de en qué momento se manifiesta el daño por ella sufrido. Basado en ello, lo más que podría argumentarse es que el estatuto en controversia puede tener un *efecto discriminatorio.*

Como es sabido, para que ello justifique la declaración de inconstitucionalidad de un estatuto se requiere que se demuestre que el legislador, al aprobar la ley, tenía *el propósito específico de discriminar* contra esas personas. *Jefferson* v. *Hackney,* 406 U.S. 535 (1972); *Washington* v. *Davis,* 426 U.S. 229 (1976). Nos parece obvio que nuestro legislador, al aprobar el Art. 41.090(1) no tenía ese propósito.

Como segundo fundamento, la opinión emitida sostiene que en nuestra jurisdicción "el derecho a llevar una acción civil es un derecho fundamental". Dicha determinación está ba-

---

[2] Ejemplos de casos donde el estatuto claramente y de su faz establecía clasificaciones son los siguientes: *Vélez* v. *Srio. de Justicia,* 115 D.P.R. 533 (1984) (el estatuto distinguía entre negocios dedicados exclusivamente a la operación de máquinas "pinball" y negocios que además se dedicaban a otras operaciones); *U.S. Brewers Assoc.* v. *Srio. de Hacienda,* 109 D.P.R. 456 (1980) (el estatuto distinguía entre productores de cerveza con cierto volumen de producción y productores con un volumen mayor); *Wackenhut Corp.* v. *Rodríguez Aponte,* 100 D.P.R. 518 (1972) (el estatuto distinguía entre guardianes empleados por agencias de seguridad y guardianes en su capacidad individual); *Pueblo* v. *Avilés,* 54 D.P.R. 272 (1939) (el estatuto distinguía entre personas que poseían armas de fuego antes de la vigencia de la ley, y los que las poseyeran después de la vigencia de la ley).

sada en un *dictum* contenido en el caso de *Torres* v. *Castillo Alicea*, 111 D.P.R. 792 (1981), donde el Tribunal traduce una porción de la obra del profesor L. H. Tribe, *American Constitutional Law*, Mineola, Foundation Press, Inc., 1978, Sec. 16-7, pág. 1002. La cita original en el idioma inglés lee:

Legislative and administrative classifications are to be strictly scrutinized and thus held unconstitutional absent a compelling governmental justification if they distribute benefits or burdens in a manner inconsistent with *fundamental rights*. For the purpose of equal protection analysis, classifications may create inequalities bearing on fundamental rights in two distinct ways.

First, *inequalities* with respect to a liberty, property, or other interest, such as the interest in securing a judicial decree of divorce, or in receiving welfare benefits, *may be structured in such a way as to deter or penalize the exercise of a right independently protected against governmental interference*. This is frequently one of the effects of state and federal durational residency requirements, which discriminate against all individuals who have recently moved into the discriminating jurisdiction, and in that sense are said to penalize the exercise of the constitutional right to travel interstate. *Second, and more intrinsic to the concept of equal protection, the inequalities may impinge directly on access to, or levels of, a right deemed fundamental in the specific sense that departures from equality in its availability or enjoyment are suspect.* Such inequalities are particularly injurious when they interfere with either of the two major sources of political and legal legitimacy—namely, voting, and *litigating*—or with the exercise of intimate personal choices. (Citas omitidas y énfasis nuestro.)

Al comparar la traducción que hizo el compañero Juez Díaz Cruz en el caso de *Torres* v. *Castillo Alicea*, ante, con el texto original de la misma podemos notar que se tradujo *litigating* como "acción civil". La traducción correcta hubiera sido, naturalmente, "litigar", lo cual se define por el Diccio-

nario de la Lengua Española de la Real Academia como "disputar en juicio sobre una cosa". (3)

Un examen de la obra antes citada del profesor Tribe revela que éste no se refiere al derecho en sí de llevar, instar o radicar una acción civil ante los tribunales. La posición que él realmente sostiene es a los efectos de que el Estado no puede crear desigualdades en el ejercicio del derecho a litigar, independientemente del hecho de que éste sea o no un derecho fundamental. Este es el caso cuando se imponen requisitos de índole pecuniaria que impiden que *ciudadanos indigentes* puedan obtener una adjudicación de sus reclamaciones; esto es, lo fundamental para Tribe es el "derecho a la igualdad de condiciones en la litigación". Lo anterior se desprende no sólo del uso en sí del concepto *litigating* sino de la nota al calce número 5 que inmediatamente aparece después del término citado, mediante la cual nos refiere a otras secciones de su obra. Prueba de la corrección de nuestra interpretación es que, luego de analizar la jurisprudencia pertinente del Tribunal Supremo Federal, el profesor Tribe concluye:

> The Court's treatment of the right of access to meaningful adjudication illustrates the principle that decisionmaking processes made essential by the government *must not simultaneously be denied because of poverty* to those who are obliged to rely upon such processes. (Cita omitida y énfasis nuestro.) (4)

Por otro lado, la determinación de la mayoría del Tribunal de que el derecho a llevar una acción civil es uno "fundamental" es una no solamente errónea sino sumamente delicada y peligrosa. La misma tiene el efecto de que *todo* estatuto pres-

---

(3) Real Academia Española, *Diccionario de la Lengua Española*, 19na ed., Madrid, Ed. Espasa-Calpe, 1970, pág. 810. Véase, en adición, la definición de *litigate* que aparece en H. C. Black, *Black's Law Dictionary*, 5ta ed., St. Paul, Minnesota, West Pub. Co., 1979, pág. 841.

(4) L. H. Tribe, *American Constitutional Law*, Mineola, Foundation Press, Inc., 1978, pág. 1008.

criptivo existente en nuestro ordenamiento jurídico tendrá que ser examinado a la luz del criterio de escrutinio estricto aun cuando no esté presente un problema de clasificación o discriminación legislativa. La opinión del Tribunal tiene el alcance y efecto de que prácticamente ningún estatuto de prescripción podría subsistir por cuanto según la propia opinión la "certidumbre en las relaciones jurídicas" no cualifica como un "interés apremiante".

En resumen, tenemos que hasta el día de hoy no existe precedente alguno, local o federal, que sostenga que el derecho a radicar una acción civil es uno fundamental. En adición, vistas las consecuencias funestas que tendría el así resolverlo, constituye un grave error que el Tribunal así lo sostenga mediante la opinión que hoy se emite.

De manera pues que aun cuando se aceptara —a los fines de la argumentación— que el estatuto en controversia establece algún tipo de clasificación, y por lo tanto estuviera sujeto a ataque bajo la cláusula de igual protección, al no poder ser considerado el derecho a radicar una acción civil uno fundamental, el criterio a aplicarse sería el de "escrutinio mínimo". Como sabemos, el mismo sólo requiere que el Estado demuestre un "interés legítimo" y un nexo racional entre ese interés y la clasificación utilizada. *León Rosario* v. *Torres*, 109 D.P.R. 804 (1980). Resulta obvio que no habría violación de la cláusula de igual protección por cuanto el garantizar la prestación de servicios médicos a nuestro pueblo es un fin legítimo y el estatuto racionalmente fomenta dicho interés.

## II

Con el propósito de sostener la posición absolutista que asume respecto a la violación de la cláusula constitucional sobre debido procedimiento de ley, el Tribunal expresa que una "regulación que elimina la causa de acción *antes de que ésta pueda interponerse legítimamente* constituye una abrogación de dicho derecho". Sostiene, en adición, que el "tér-

mino prescriptivo del Art. 41.090 del Código de Seguros, en su plazo absoluto, puede tener el efecto de exigirle a los demandantes cumplir con lo imposible: *demandar antes de que tengan conocimiento de su causa de acción . . .*". (Énfasis suplido.)

Dicho lenguaje, sin más, resulta extremadamente peligroso. Se eleva, por decirlo así, a "rango constitucional" el "requisito del conocimiento", el llamado *discovery rule* de las jurisdicciones estadounidenses. Ello tiene el efecto de que *ningún* término prescriptivo puede comenzar a contarse hasta que el perjudicado o agraviado por el mismo tenga "conocimiento" de su causa de acción. Dicho de otra forma, el resultado práctico de la decisión que hoy se emite es que *todos* los términos prescriptivos existentes en nuestro ordenamiento jurídico *de naturaleza objetiva* están sujetos a un ataque constitucional bajo la cláusula del debido proceso.

Esta incertidumbre alcanzaría todos los aspectos de nuestra vida. A manera de ejemplo, en cuanto a la propiedad peligraría el término de diez (10) a treinta (30) años para la acción reivindicatoria, Arts. 1857 y 1863 del Código Civil, 31 L.P.R.A. secs. 5278 y 5293; en cuanto a las relaciones familiares se verían afectados el término de un (1) año después de la muerte del padre para que el hijo mayor de edad entable la acción filiatoria o el término de cuatro (4) años después de éste llegar a la mayoridad cuando su padre ha muerto durante la minoría de edad del hijo, Art. 126 del Código Civil, 31 L.P.R.A. sec. 505; en cuanto al patrimonio en general, peligraría el término de treinta (30) años para reclamar la herencia, Arts. 970 y 1863 (31 L.P.R.A. secs. 2807 y 5293) ([5]), y el plazo de diez (10) años para reclamar al arqui-

---

([5]) E. González Tejera, *Derecho Sucesorio Puertorriqueño*, San Juan, Ramallo Bros. Printing, Inc., 1983, Vol. 1, págs. 220–223.

tecto o contratista por vicios ocultos, Art. 1483 del Código Civil, 31 L.P.R.A. sec. 4124. (6)

En las jurisdicciones civilistas como la nuestra se fundamenta o justifica la institución de la prescripción a base de dos teorías: una es la llamada subjetiva o individual y la otra es la objetiva o social. J. Santos Bris, *Derecho Civil, Teoría y Práctica*, Madrid, Ed. Revista Derecho Privado, 1978, T. I, pág. 685; J. Puig Brutau, *Fundamentos de Derecho Civil*, 3ra ed. rev., Barcelona, Ed. Bosch, 1979, T. I, Vol. I, págs. 849–850; Albaladejo, *op. cit.*, págs. 486–487; R. De Ruggiero, *Instituciones de Derecho Civil*, Madrid, Ed. Reus, 1979, T. I, pág. 324.

La teoría subjetiva o individual visualiza la prescripción como una sanción al litigante negligente. Puig Brutau, *op. cit.*, lo expresa de la siguiente manera:

De este concepto de la prescripción, basada en la inactividad del titular durante un cierto período de tiempo, cabe deducir que el fundamento de la prescripción extintiva puede situarse en el hecho de que el legislador considera desfavorablemente la actitud de quien descuida ejercitar oportunamente sus derechos —y de ahí el aforismo romano "vigilantibus et non durmientibus iura succurrent"—, y por ello se establece la posibilidad de que los derechos que competen a una persona queden extinguidos si el interesado en hacer valer la prescripción invoca esta sanción de carácter civil aplicable a todo titular negligente.

La teoría objetiva o social justifica "la existencia de la prescripción como institución necesaria que sirv[e] para asegurar la estabilidad económica, transformando en situación

---

(6) M. Albaladejo expresamente reconoce que los plazos de tipo objetivo son la regla, y los plazos de tipo subjetivo son la excepción; "Esa ejercitabilidad *en abstracto*, que puede calificarse de *objetiva*, es la regla; de la que el propio Código exceptúa algún caso . . . en el que comienza la prescripción desde que el interesado conoce el hecho de que la acción nace". (Énfasis en el original.) *Derecho Civil*, 8va ed., Barcelona, Ed. Bosch, 1983, T. I, Vol. II, pág. 500.

de derecho lo que sólo era de mero hecho, ya que sin este medio la propiedad y los derechos todos estarían expuestos a una incertidumbre e inseguridad propia de lo que constituye su esencia . . .". V. Prieto Cobos, *Ejercicio de las acciones civiles*, 5ta ed., Pamplona, Ed. Aranzadi, 1983, T. I, Vol. II, págs. 1088–1089.

Entendemos que el argumento de la renuncia y la sanción sólo tiene cierta validez en los pocos casos donde el término prescriptivo empieza a contar desde que se conocen los hechos que dan lugar al nacimiento de la causa de acción. Bajo este fundamento se podría explicar el primer término del estatuto en controversia: que la acción se presente a más tardar un año desde que se conoce el daño.

El segundo término, sin embargo, sólo puede justificarse bajo el fundamento objetivo o social. [7] Bajo este fundamento, el término prescriptivo es necesario no sólo para proteger la certidumbre y la seguridad en las relaciones jurídicas, como hemos dicho antes, sino que es necesario para evitar que por el pasar del tiempo el demandado o deudor se encuentre en estado de indefensión por la pérdida de la prueba necesaria para su defensa, Puig Brutau, *op. cit.*, pág. 850; Albaladejo, *op. cit.*, págs. 486–487.

Un término prescriptivo, por ende, debe representar un *adecuado balance* entre estos factores por un lado y el derecho patrimonial del demandante por otro. Hicimos hincapié en que los términos prescriptivos deben responder a este balance cuando dijimos en *Colón Prieto* v. *Géigel*, 115 D.P.R. 232, 243 (1984):

> Sin embargo, ninguno de los intereses a los cuales responde [el término prescriptivo] es absoluto —de un lado salvaguardar un derecho y del otro darle carácter definido a la

---

[7] En *Ortiz* v. *Municipio de Orocovis*, 113 D.P.R. 484 (1982), expresamos que el fundamento del término prescriptivo debe concebirse objetivamente.

incertidumbre de una posible reclamación— sino que deben ser aquilatados en su justa proyección.

Ahora bien, quien está llamada en primer término a hacer este balance es la Legislatura y los tribunales no deben hacer a un lado la acción legislativa a menos que ésta haya cometido un "error palpable" al establecer el correspondiente término prescriptivo, ver: *Terry* v. *Anderson*, 95 U.S. 628, 633 (1877); o diríamos nosotros, si el término resulta excesivamente opresivo para el demandante, sin encontrar justificación en la necesidad de evitar la incertidumbre y la indefensión del demandado.

En resumen, una ley de la Asamblea Legislativa mediante la cual se fija un término máximo objetivo dentro del cual tienen que se radicadas las acciones por impericia médica no viola per ser la cláusula constitucional sobre debido procedimiento de ley. Únicamente queda ésta infringida cuando el término establecido resulta opresivo por ser irrazonablemente corto. ([8])

## III

¿Es inconstitucional el término de dos (2) años establecido por el Art. 41.090(1) del Código de Seguros de Puerto Rico?

---

([8]) La posición asumida por la compañera Juez Asociada Hon. Miriam Naveira de Rodón —dicho con el mayor respeto— resulta contradictoria. Entendemos no es conciliable lo expresado por ella en el texto de su ponencia a los efectos de que en el presente caso se viola la cláusula de debido proceso en forma "definitiva, pues los demandantes por no conocer el daño antes del término fatal se ven privados de todo tipo de remedio" con lo expresado posteriormente, en el escolio 7, a los efectos de que ello no impide que la "Asamblea Legislativa puede establecer otros términos que no lleven consigo una posibilidad de error tan grande como la del término aquí anulado".

*Siempre* existirá la posibilidad de que el "otro término" —no importa lo extenso que sea— no sea lo suficientemente amplio como para que no "viole" un daño latente en particular que se manifieste luego de cumplirse el término.

Por no estar claro al momento de celebrarse los procedimientos ante los tribunales de instancia que el criterio determinante al evaluar la constitucionalidad del estatuto prescriptivo en controversia lo es la razonabilidad del término de dos años que se provee para radicar la acción, las partes no presentaron prueba a esos efectos. La única "información" con que contamos es la que se desprende de un informe rendido por la Administración del Fondo de Compensación al Paciente para el año 1976–77, del cual una de las salas de instancia tomó conocimiento judicial. Dicho informe, en su consecuencia, no pudo ser objeto de refutación por las partes. En adición, somos del criterio que un asunto que tiene tanta importancia para nuestra ciudadanía no debe ser resuelto tomando en consideración un informe que ya resulta obsoleto.

Por tal razón, entendemos que en estos momentos este Tribunal no tiene los elementos de juicio suficientes para contestar la interrogante antes expuesta. En consecuencia, devolveríamos los casos consolidados a una de las salas de instancia para que ésta permita a las partes —inclusive, al señor Secretario de Justicia de Puerto Rico— presentar prueba pertinente a la razonabilidad del término en controversia.

Por todas las razones antes expuestas nos vemos forzados a disentir.