Rafael Colón Prieto, por sí, y la sociedad compuesta por Rafael Colón Prieto y su esposa Nilda González Casañas et al., demandantes y recurrentes, *v.* Lic. Wilfredo A. Géigel, demandado y recurrido.

*Número:* O-83-400    *Resuelto:* 29 de marzo de 1984

*Jorge Benítez Gautier*, abogado de los recurrentes; *Benito I. Rodrí-guez Massó*, abogado del recurrido.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

"La relación entre abogado y cliente puede considerarse desde varios puntos de vista. Ante todo desde el jurídico, respecto de los derechos y obligaciones que derivan para las partes del contrato de prestación de obra intelectual. . . . [S]alta a los ojos el carácter personal de la relación profe-sional, a causa del contacto humano que tiene lugar entre las partes y a causa de la naturaleza del objeto del contrato de que se trata. Sabido es que la relación que se establece entre abogado y cliente viene acotada por un carácter personal y fiduciario, así como por el hecho de que el cliente se confía a su patrocinador, debido sobre todo a la consideración que el primero tiene de las dotes de capacidad de trabajo (técnicas y morales) del segundo. . . . Está claro que de los dos sujetos de la relación profesional el abogado es el que tiene las redes en la mano y quien está destinado a desempeñar una función de arrastre en esta relación intersubjetiva, encontrándose él mismo, al menos en teoría, en posición de relativa superio-ridad respecto al cliente que, desconocedor de las reglas jurí-dicas, no conoce el ambiente forense y judicial y sufre por lo general el trauma psíquico del litigio en el que se ve envuelto como actor, como demandado o como acusado." C. Lega, *Deontología de la profesión de abogado*, Madrid, Ed. Civitas, 1976, págs. 181–182.

## I

*Trasfondo de hechos alegados*

Rafael Colón Prieto acudió al cirujano dental Philip R.

Ark quien le diagnosticó que el padecimiento que sentía en su boca era causado por cuatro cordales impactados. Recomendó extraerlos. El 10 de noviembre de 1971 Colón Prieto se sometió a una intervención quirúrgica en un hospital. Al recuperar de la operación se percató de una herida en el lado derecho de la lengua que le producía sensación de ardor, quemadura intensa e insensibilidad en dos terceras partes de la lengua. Lo informó al doctor Ark, quien alegadamente le indicó que la herida fue ocasionada por una mordida que él mismo se produjo mientras estaba bajo los efectos de la anestesia en el cuarto de recuperación y que el dolor debía desaparecer al poco tiempo.

Lamentablemente no ocurrió así. El dolor agudo persistió, afectó y limitó las actividades ordinarias de Colón Prieto. Continuó visitando al doctor Ark, quien le pronosticó una recuperación con el transcurso del tiempo. La recuperación esperada no llegó. En la última visita que hizo en marzo de 1972 el dentista alegadamente le informó que de persistir los dolores habría que cortarle un pedazo de lengua. Ante esa patética perspectiva, Colón Prieto recurrió al Dr. Ricardo Pesquera, cirujano dental. Éste lo refirió al neurocirujano Dr. Max Ramírez de Arellano, quien, luego de un estudio concluyó que la lesión sufrida no fue causada por una mordida, sino que era una *causalgia*[1] producida por una cortadura o cercenación del nervio lingual derecho.[2] Se aduce que este hecho lo conoció Colón Prieto el 10 de noviembre de 1972.

El 10 de septiembre de 1973 Colón Prieto, en unión a su esposa, Nilda González Casañas, por sí e hijos María y

---

[1] "Dolor quemante, a menudo acompañado por trastornos tróficos de la piel, causado por sección completa o incompleta u otra lesión de un nervio periférico." *Diccionario de Ciencias Médicas Dorland*, Buenos Aires, Ed. El Ateneo, 1979, pág. 247.

[2] Se reclama que esta conclusión está corroborada por un nutrido grupo de médicos locales y de Estados Unidos —peritos en la materia— quienes además concluyeron que para tal padecimiento no existe posibilidad alguna de recuperación, ni siquiera alivio.

Rafael, presentaron demanda contra el doctor Ark por alegada mala práctica, en el Tribunal Superior, Sala de Mayagüez, en que reclamaron $390,000 (Civil Núm. CS-73-3814). (3) Los emplazamientos expedidos el 14 de septiembre de 1973 no fueron diligenciados hasta el mes de agosto de 1974. En su contestación el doctor Ark planteó la defensa de prescripción por haberse presentado la demanda fuera del término de un año a partir del conocimiento del daño. (4)

El abogado original de Colón Prieto, Lic. Manuel A. Moreda, renunció. Fue sustituido por el Lic. Wilfredo A. Géigel. Continuaron los trámites correspondientes. El 31 de marzo de 1978 las partes acordaron —con el visto bueno del Juez Superior Juan E. Lugo Rodríguez— posponer la vista en su fondo del 18 de abril con el propósito de dilucidar previamente la defensa de prescripción. De prosperar, resultaba académico continuar el proceso.

El día de la vista —que las partes entendían pospuesta— otro juez, ajeno al acuerdo de suspensión y sin el beneficio de una constancia o anotación en los autos, ante la incomparecencia de ambas partes dispuso el archivo de la demanda e impuso a sus abogados una sanción económica para beneficio del Estado. El licenciado Géigel objetó la sanción mediante escrito del 26 de abril de 1978. Además el 27 de abril solicitó se dejara sin efecto la sentencia. Ambas peticiones fueron declaradas sin lugar. Infructuosamente presentó moción para reiterar esas súplicas. El 5 de junio formuló moción en que solicitó el relevo de sentencia y orden, la cual fue declarada improcedente. El 20 de julio presentó moción informativa y solicitud de vista. Tampoco fue admitida. El 11 de diciembre radicó una moción bajo la Regla 49.2 de las de Procedimiento Civil. Fue denegada por falta de jurisdicción.

_____

(3) Existe jurisprudencia norteamericana en que se impone responsabilidad por laceraciones a la lengua durante tratamiento dental. Véase *Dental Malpractice*, 23 NCCA 4th 32–37 (1978).

(4) Obsérvese que la causa de acción nace antes del 30 de mayo de 1976. Por ende, no es de aplicación la Ley Núm. 74 de ese año, y sí el Art. 1868 del Código Civil, 31 L.P.R.A. sec. 5298.

Finalmente, sin éxito, el 18 de enero de 1979 solicitó reconsideración y relevo de orden. En total presentó ante el foro de instancia seis (6) escritos. No pidió revisión de ninguna de esas resoluciones ante este tribunal apelativo.

Colón Prieto demandó en el Tribunal Superior, Sala de San Juan, al licenciado Géigel por mala práctica legal. Alegó que dejó transcurrir el término para solicitar revisión ante este Tribunal y que no vino en conocimiento del archivo de su causa hasta dirigirse, por iniciativa propia, al Tribunal Superior de Mayagüez para inquirir el estado de su reclamación.

Previo ciertos trámites de rigor, la Sala de San Juan (Hon. Flavio E. Cumpiano), desestimó sumariamente la demanda al resolver que estaba prescrita la reclamación original contra el doctor Ark. Además sostuvo:

> Tomado, como fue, por sorpresa por la sentencia de archivo, el Lcdo. Wilfredo A. Géigel, ni lento ni perezoso, procedió de inmediato a reclamar por los derechos de su cliente, haciéndolo en forma insistente y firme. Pero como en nuestro sistema rogado de derecho unos piden y otros adjudican, sus peticiones, aunque bien formuladas, no fueron exitosas. No constituye acto negligente, generador de responsabilidad extracontractual, el no poder convencer a un magistrado de lo inapropiado o de la incorrección de su determinación y de los méritos y la procedencia de la petición formulada.

Finalmente, consignó:

> El análisis que antes hemos hecho apunta a que no hubo acción u omisión por parte del Lcdo. Wilfredo A. Géigel que se pueda considerar culposa o negligente, pues apreciamos que en la atención del caso él cumplió con la práctica y las normas profesionales generalmente reconocidas por la profesión legal. Por otro lado, también hemos concluido que la razón que llevó al juez a archivar el caso no era imputable al Lcdo. Wilfredo A. Géigel, por lo que no existe el nexo causal entre el alegado daño y la acción u omisión motivadora. Por último, indicamos nuestro parecer de que no hubo daños. La falta de cualquiera de los tres elementos es suficiente para desestimar esta demanda.

A solicitud de Colón Prieto revisamos.

## II

*Principios generales de responsabilidad*

█ Coincidimos con la ilustrada sala sentenciadora de que no existe negligencia de un abogado por no comparecer a una vista *pospuesta* por acuerdo de las partes y la *anuencia* de un magistrado. Sin embargo, el ámbito de negligencia imputada al demandado Géigel no es esa, sino aquella que surge con posterioridad a esa actuación, a saber, alegadamente no haber cumplido con el deber de informar y la relativa a su falta de diligencia en torno a no agotar los remedios en apelación.

El marco conceptual de esta acción lo encontramos en el siguiente pasaje jurídico:

> El que ejerce una profesión liberal, sea de la clase que sea, y ofrece y presta sus servicios al público, está obligado a tener los conocimientos suficientes para ello, además de poner de su parte cuanto sepa para cumplir su cometido. No es suficiente poseer un título académico, a pesar de ser, en muchos casos, elemento indispensable para el ejercicio de la profesión, porque el progreso de las ciencias en unos casos, y las nuevas complicaciones que con el tiempo van surgiendo, en otros, hace precisa la diligencia debida, con posterioridad a la posesión del título académico. Y a pesar de poseer dicho título, el que ejerce una profesión, si por no tener los conocimientos, causa un perjuicio a su cliente, tiene el deber de indemnizar; porque culpable es el que, sabiendo su falta de competencia, ejerce la profesión. A. Borrell Maciá, *Responsabilidades derivadas de culpa extracontractual civil*, 2da ed., Barcelona, Ed. Bosch, 1958, pág. 66.

█ Para explorar y darle contenido específico a este concepto primeramente hemos de dejar sentados los elementos que enmarcan una reclamación por negligencia contra un abogado. Esencialmente la responsabilidad civil de un abogado (deber de responder) se configura a base de los elementos típicos de toda acción en daños contra un profesional.

Son: (1) que la existencia de una relación de abogado-cliente que genere un deber; (2) que el abogado, por acción u omisión, lo viole; (3) que esa violación sea la causa próxima del daño al cliente; y (4) que el cliente, como reclamante, sufra daño o pérdida. D. Meiselman, *Attorney Malpractice: Law and Procedure*, Rochester, New York, The Lawyers Cooperative Pub. Co., 1980, págs. 39–40.

"Aun cuando existen variaciones en la caracterización de los elementos sobre la norma de cuidado, es posible precisar una definición que no dependa necesariamente de un promedio matemático de preferencias judiciales, como tampoco de la acción u omisión particular envuelta. El punto de partida es el de 'hombre razonable', ese ideal platónico que define la conducta apropiada de todos aquellos que desean evitar incurrir en responsabilidades. El abogado simplemente es una persona razonable que ha asistido a una escuela de derecho, ha obtenido un diploma, ha sido admitido a ejercer y que, tal vez, de la experiencia adquirió alguna sabiduría. Así, el 'hombre razonable' se transforma en el 'abogado razonable'." R. Mallen, *Legal Malpractice*, 2da ed., St. Paul, Minnesota, West Publishing Co., 1981, Sec. 252, pág. 321.

Los deberes de todo abogado para con su cliente, en términos generales, están plasmados en el Código de Ética Profesional. En su relación con los clientes tiene las siguientes obligaciones: actuar con destreza y cuidado, informarle sobre sus honorarios, proteger sus intereses, cumplir con las instrucciones por medios permisibles, consultarlo sobre dudas que no caigan en el ámbito discrecional, y mantenerlo informado sobre todo lo necesario. J.P. Eddy, *Professional Negligence*, Londres, Stevens & Sons Ltd., 1956, págs. 27–28.

*Principio de información*

Este deber, cuya génesis es el "principio de información", significa que el abogado, además de representar a un cliente con fidelidad, lealtad y diligencia, debe siempre

mantenerlo informado de todo asunto importante que surja en el desarrollo del caso cuya atención le ha sido encomendada. *In re Cardona Vázquez*, 108 D.P.R. 6, 18 (1978).

■ No es necesario mucho esfuerzo mental para aceptar que una sentencia de archivo —o en sus méritos— que pone fin parcial o adjudica totalmente la causa de acción y derechos, claramente cae entre los asuntos a ser informados inmediatamente por el abogado al cliente. "El principio de información desarrolla su eficacia también durante la tramitación del litigio *y en su fase conclusiva. El abogado está llamado a informar diligentemente y a su debido tiempo a su asistido sobre las vicisitudes de la controversia, con mayor premura y atención cuando el mismo cliente sea sujeto activo de determinadas vicisitudes procesales . . .*". Lega, *op. cit.*, pág. 143.

*Principio de diligencia*

■ En Puerto Rico rige lo que la doctrina denomina "principio de diligencia". "Los comportamientos contrarios a la diligencia se consideran negligentes." Lega, *op. cit.*, pág. 122. "Siendo la lucha la ley de la actividad jurídica, quien es negligente no ejerce, sino sólo simula ejercer el derecho." J. B. Iturraspe, *Función Social de la Abogacía*, 2da ed., Santa Fe, Argentina, Ed. Castellví, 1967, pág. 44. Invariablemente hemos requerido de los abogados "celo, cuidado y diligencia" en la tramitación de asuntos judiciales. *Acevedo v. Compañía Telefónica de P.R.*, 102 D.P.R. 787, 791 (1974); *In re Rodríguez Torres*, 104 D.P.R. 758, 765 (1976).

■ En este caso el principio de diligencia se plantea en lo relativo al deber de apelar. ¿Tiene ese encargo implícitamente en todo caso resuelto adversamente a su cliente? Obviamente la contestación es en la negativa. No todos los casos tienen méritos suficientes para ser llevados en alzada. Sólo aquellos casos en que luego de ser evaluados objetiva, crítica y desapasionadamente el abogado se convence de que tienen méritos suficientes para ser considerados en una ape-

lación. Como regla general, en ausencia de convenio el abogado no tiene esa obligación con su cliente una vez dictada la sentencia. *Pueblo* v. *Jiménez*, 77 D.P.R. 687 (1954). Sin embargo, ello no debe confundirse con la responsabilidad que existe de salvaguardar el derecho de apelar. Véase Anot., *Attorneys—Negligence—Liability*, 45 A.L.R.2d 9, Sec. 21 (1956). Entre la defensa de los derechos de un cliente está revisar los dictámenes judiciales que le son adversos. "[C]omo no existe un deber, un abogado no es responsable por una apelación tardía, por el solo hecho de que no renunció antes de expirar el término. Sin embargo tiene el deber de asesorar al cliente sobre su derecho de apelar y los métodos relativos a ese remedio. Hay una diferencia sustancial entre instar una apelación y asesorar al cliente sobre el derecho y la oportunidad del remedio. Como lego, no puede esperarse que el cliente reconozca o evalúe las avenidas remediales ulteriores. Únicamente el abogado puede hacerlo." Mallen, *op. cit.*, Sec. 101, pág. 176.

### III

*Ámbito de posible responsabilidad del abogado Géigel*

Los principios expuestos deben aplicarse para evaluar en su oportunidad la explicación del licenciado Géigel de que no instó un recurso en alzada por entender que las gestiones que estaba haciendo ante el foro de instancia eran suficientes, pues éste había incurrido en un *error claro*. Adujo "por otro lado, [que] ir en alzada al Tribunal Supremo sobre una cuestión subsidiaria cuando el asunto principal no había sido resuelto y además estaba en duda, no lo consider[aba] prudente". Es menester resolver si esas gestiones fueron suficientes. Sus diligencias no deben evaluarse a base de un criterio cuantitativo, como parece intimar el tribunal sentenciador, sino por lo adecuadas y por sus resultados. No podrá ser eximente de responsabilidad el razonamiento de que no vino en alzada a base de que era una "cuestión subsidiaria". Por el contrario, el argumento es de doble filo. El archivo de un caso en circunstancias tales que a su juicio

constituía un "error claro" no puede estimarse como subsidiario, máxime cuando representó la pérdida de la acción de Colón Prieto contra el doctor Ark sin oportunidad de ventilarla en sus méritos.

■■ El deber de proteger el derecho de apelación va inexorablemente ligado al de "comunicación". El Canon 19 del Código de Ética Profesional impone al abogado "mantener a su cliente *siempre* informado de todo asunto importante que surja en el desarrollo del caso que le ha sido encomendado". La razón de este mandato es claro. Sólo debidamente informada una persona puede optar por determinado curso de acción procesal y evitar, si posible, perjuicio a su reclamación. Aquí se alega que el abogado Géigel violó también ese deber. Ambos aspectos deben dilucidarse en juicio plenario y no mediante sentencia sumaria.

## IV

*Relación causal*

■■ La naturaleza de una reclamación por mala práctica profesional, en contraste con otras, resulta más compleja respecto al elemento de la relación causal. El actor tiene que probar que tenía una causa de acción válida que se vio malograda por la negligencia del abogado. Esta exigencia peculiar, de perfiles propios, denominada por los tratadistas "un caso dentro del caso" significa que el "cliente debe establecer que él debió ganar el primer caso como paso previo para ganar el segundo". J. Wade, *The Attorney's Liability for Negligence* en *Professional Negligence* (Roady & Andersen eds.), Tennessee, Vanderbilt Univ. Press, 1960, pág. 231.

La necesidad de litigar el caso previo alegadamente frustrado para abrir las puertas al segundo implica ventilar todos los puntos y elementos clásicos de un proceso ordinario, con la única variante que, de hallarse probada la causa original, no podrá exigirse de la parte culposa resarcimiento. Simplemente habrá terminado el prólogo del proceso para

entonces comenzar la segunda etapa e intentar establecer la responsabilidad del abogado.

En este caso el tribunal a quo estimó que la causa original de Colón Prieto contra el doctor Ark estaba prescrita, pues éste invocó oportunamente dicha defensa. Como consecuencia concluyó que la instada contra el abogado Géigel no tenía posibilidades de prevalecer. También erró.

La institución de la prescripción extintiva aspira a asegurar la estabilidad de la propiedad y la certidumbre de los demás derechos. *Agulló* v. *ASERCO*, 104 D.P.R. 244, 248 (1975). Su innegable necesidad y valor responden a "una presunción legal de abandono, derivada del hecho del transcurso de un tiempo determinado sin reclamar un derecho". *Eisele* v. *Orcasitas*, 85 D.P.R. 89, 93 (1962). Sin embargo, ninguno de los intereses a los cuales responde es absoluto —de un lado salvaguardar un derecho y del otro darle carácter definido a la incertidumbre de una posible reclamación— sino que deben ser aquilatados en su justa proyección.

El período ante nuestra consideración está fijado en el segundo párrafo del Art. 1868 del Código Civil que reza: "Prescriben por el transcurso de un año . . . [l]a *acción para exigir la responsabilidad civil* . . . por las obligaciones derivadas de la culpa o negligencia de que se trata en el artículo 1802 de este título *desde que lo supo el agraviado*." (Énfasis suplido.) 31 L.P.R.A. sec. 5298.(5)

El demandado Géigel basa la defensa de prescripción en que el término se inició desde que Colón Prieto se percató de que tenía un daño. En su apoyo cita *González* v. *Pérez*, 57 D.P.R. 860 (1941), en el cual unos balaustres caen sobre una persona y le producen lesiones. El allí lesionado interpuso la demanda después del año del accidente. Este foro decidió que la reclamación estaba prescrita. El citado caso es distinguible. Es más bien un ejemplo de la regla general, pues

---

(5) La presentación de la demanda contra el doctor Ark fue con anterioridad a la Ley Núm. 74 del 30 de mayo de 1976 (26 L.P.R.A. sec. 4101 *et seq.*).

el actor "sabía", esto es, conocía que se le había causado un daño y tenía consciencia de la responsabilidad e identidad del autor.

En un caso como el deducido contra el doctor Ark, ¿cuál es el verdadero punto de partida para la prescripción? Primeramente, debe notarse que la frase *"desde que lo supo el agraviado"* es con referencia a la responsabilidad civil *ex delicto*. Segundo, la doctrina rechaza una interpretación literal y restrictiva. Así, Borrell Maciá explica que "prescribe por el transcurso de un año a contar desde que lo supo el agraviado; y *pudo ejercitar la acción,* añade la jurisprudencia. . . . El aditamento de la jurisprudencia es lógico, y está de acuerdo con los principios generales que regulan la prescripción. Si ésta tiene su fundamento al establecer la pérdida de derechos, en el abandono del que los posee, precisa que realmente se dé tal abandono; y si no puede ejercitarse la acción, no puede decirse que exista. . . . Por ello parece que hasta tal momento no debería iniciarse el plazo de prescripción, ya que es igual no poder ejercitar las acciones por imposibilidad física o ignorancia del hecho causante del perjuicio, que por ignorar que se tienen. Naturalmente que si la ignorancia de que se trata fuese debida a negligencia o descuido del interesado, a nadie más que a él podrían atribuirse las consecuencias de tal descuido, y no parecería lógico, en tal caso, una reserva de derechos o un aplazamiento en el inicio del plazo de prescripción". Borrell Maciá, *op. cit.*, págs. 344–345. Igualmente, Santos Briz, al comentar una sentencia española, consigna que "para que la justicia quede a salvo en todo caso, con que el agraviado haya sabido de la obligación de reparar daños: se ha de requerir, *además,* que haya podido ejercitar la acción". (Énfasis suplido.) La brevedad del plazo justifica este criterio. J. Santos Briz, *Derecho de Daños*, Madrid, Ed. Rev. Der. Privado, 1963, pág. 293 esc. 66.

Esta orientación parte de la premisa de que la ignorancia del titular del derecho sobre si ha nacido o no una acción

derivada de un acto ilícito es pertinente y determinante. Adopta la tesis *subjetiva* frente a la *objetiva*. Sobre estas dos posiciones y sus diversos criterios, el Tribunal Supremo de España, en sentencia de 24 de septiembre de 1965, Núm. 3995, Aranzadi, XXXII Repertorio de Jurisprudencia 2456, expresa:

[E]n el terreno teórico o doctrinal, cabe la adopción de un criterio meramente "objetivo" que atiende sólo a la fecha de producción del hecho, con independencia del conocimiento que, del mismo, pueda tener el accionante o de un punto de vista "subjetivo" exigiendo que la realización o efectividad de aquél, sea conocida por el agraviado ya que éste, mal puede manifestar antes, su voluntad de ser resarcido, conforme a la ley, puesto que "nihil volitum, nisi praecognitum" y si el primer criterio, lo abonan razones de certidumbre jurídica, el segundo se ofrece como más razonable y equitativo siendo, en definitiva, el adoptado por el art. 1968 n. 2.º de nuestro C. Civ., [1868 del nuestro] que prescribe, entre otras, por el transcurso de un año, la acción para exigir la responsabilidad por las obligaciones derivadas de la culpa o negligencia, de que no se trata en el art. 1902 [1802 nuestro] "desde que lo supo el agraviado".

En el caso de autos Colón Prieto se percata de la lesión en su lengua el día 10 de noviembre de 1971. Al inmediatamente inquirir, su médico, el doctor Ark, le indicó que la herida fue el resultado de una mordida que él mismo se produjo. En varias ocasiones volvió a ver al doctor Ark. El que continuara padeciendo —como enfatiza el tribunal sentenciador— no significa necesariamente que sabía la génesis del daño. El propio doctor Ark le decía y reafirmaba que se aliviaría. La última vez que lo consultó le dijo que si la condición seguía, volviera a los cuatro meses. Es razonable pensar que Colón Prieto confiaba en lo que su médico le decía, pues es obligación de todo galeno informar el estado y pronóstico clínico, excepto en situaciones o casos en que ese informe dificulte el tratamiento o agrave el curso de acción del paciente.

■ En estas circunstancias no puede imputársele conocimiento del daño desde la operación. Como paciente confió en ese galeno. No es hasta que consulta otros médicos, en particular al doctor Ramírez de Arellano, que el 10 de noviembre de 1972 sabe que su lesión no fue resultado de una mordida, sino de una cercenación del nervio lingual derecho. En ese momento es que conoce que el daño fue causado probablemente por impericia del médico doctor Ark. Bajo el criterio "subjetivo" aplicable a acciones contra médicos, el término prescriptivo comenzó desde esa fecha y al radicar su demanda estaba viva su causa de acción.

Adviértase que la relación médico-paciente constituye "un acto de confianza para las dos partes; principalmente, desde el ángulo del paciente que elige al médico". A. J. Bueres, *Responsabilidad Civil de los Médicos*, Buenos Aires, Ed. Ábaco, 1979, pág. 54. Como tal, Colón Prieto entregó el cuidado de su salud —diagnóstico, intervención quirúrgica y tratamiento posterior— al doctor Ark sin más seguridad que descansando en su buena fe, capacidad y opinión. Como afirma Puig Brutau, "[p]ero una cosa es que la persona ignora que le asiste un derecho, y que por tanto desde entonces puede ejercitarlo, y otra bien distinta que de una forma más o menos subrepticia se oculte al titular de un derecho una lesión del mismo, y que por tanto a partir de esta lesión —que se mantiene oculta— nace la correspondiente acción para hacer valer tal derecho". Y "no puede entenderse nacida la acción cuando la lesión del derecho ocurra en unas circunstancias tales que supongan un acto clandestino u oculto del cual no pueda tener conocimiento el titular del derecho, que actúa con el grado normal de diligencia que establece la ley". J. Puig Brutau, *Fundamentos de Derecho Civil*, Barcelona, Ed. Bosch, 1979, T. I, Vol. 1, 2da parte, págs. 876–877.

■ La posición señalada es la más justa y equitativa. Salvaguardamos el derecho de reclamar del perjudicado y no premiamos a aquel que, habiendo causado el daño, se refugió en la confianza e ignorancia de su paciente para

beneficiarse y derrotar la acción. "Por lo demás, al perjudicado, para ejercitar la acción, no le basta saber que lo ha sido, *sino que precisa conocer quién es el autor del daño,* para poder dirigir la demanda contra él, saber a quién debe demandar; *por lo cual, a la noticia del daño ha de añadirse la del que lo causó, para que corra la prescripción.*" (Énfasis nuestro.) A. Borrell y Soler, *Derecho Civil Español,* Barcelona, Ed. Bosch, 1955, T. I, Parte General, pág. 500. Véanse: M. J. Argañarás, *La Prescripción Extintiva,* Buenos Aires, Ed. Tea, 1966, pág. 245; L. Enneccerus, *Tratado de Derecho Civil,* Barcelona, Ed. Bosch, 1966, T. II, Vol. 2, 2da parte, pág. 1163.

Resolvemos que el período prescriptivo de un año en la acción contra el Dr. Philip R. Ark comenzó a correr desde el 10 de noviembre de 1972, fecha en que el doctor Ramírez de Arellano le notificó a Colón Prieto que su lesión se debía a una cercenación del nervio lingual derecho. La demanda contra el doctor Ark no estaba prescrita.

Por los fundamentos expuestos *se dictará sentencia en que se revoque la del tribunal de instancia. Se devolverá a dicho foro el caso para la continuación de trámites compatibles con esta opinión.*

El Juez Presidente Señor Trías Monge y el Juez Asociado Señor Díaz Cruz concurren en el resultado sin opinión. El Juez Asociado Señor Rebollo López no intervino.