# 2006 DTA 15

**TRIBUNAL DE CIRCUITO DE APELACIONES
REGIÓN JUDICIAL DE SAN JUAN
PANEL V**

ANA LUNA MARTÍNEZ Y OTROS
Recurridos

v.

HOSPITAL UNIVERSITARIO Y OTROS
Peticionarios

Núm. KLCE-05-01084

San Juan, Puerto Rico, a 16 de noviembre de 2005

Panel integrado por su Presidente, el Juez Rivera Martínez,
y los Jueces González Rivera y Ramírez Nazario

González Rivera, Juez Ponente

**TEXTO COMPLETO DE LA RESOLUCIÓN**

La Universidad de Puerto Rico (en adelante U.P.R.) acude mediante el presente recurso de *certiorari* para que sea revisada una resolución del Tribunal de Primera Instancia, Sala de San Juan. Mediante el referido dictamen, el foro de instancia denegó desestimar una demanda incoada contra esa institución. La U.P.R. insiste en que la causa de acción ejercitada en su contra está prescrita.

Habida cuenta de que los errores imputados no fueron cometidos, denegamos la expedición del auto solicitado y devolvemos el caso para la continuación de los procedimientos.

**I**

El 28 de junio de 1993, Ana Angélica Luna Martínez y su madre, Angélica Martínez León, presentaron una demanda por impericia médica contra el Hospital Universitario, el Estado Libre Asociado de Puerto Rico (en adelante E.L.A.), la U.P.R., las compañías aseguradoras, la Dra. Norma Miranda, el Dr. Carlos Cintrón y las Sociedades Legales de Gananciales compuestas por ellos y sus respectivas parejas, de nombres desconocidos.

Según se desprende de la demanda, el 10 de febrero de 1965 nació un bebé en el Hospital Municipal de Cayey con la condición de *genitalia externa ambigua*. El doctor que atendió el parto, le comunicó a la madre que era varón. De ahí que el bebé fue llamado Orlando.

Se alegó que pocos días después, le recomendaron a la madre que llevara al bebé al Hospital Universitario a la atención de la Dra. Norma Miranda. Cuando la Dra. Miranda lo evaluó, expresó que era una niña. Dentro de varios procedimientos quirúrgicos realizados entre 1966 y 1967, se le practicó una incisión urogenital, una *vaginoplastía* y se le reparó el clítoris. En el año 1967, se le cambió el nombre de Orlando a Ana Angélica, mediante un procedimiento judicial. █

Alegadamente, a la edad de 4 años, Ana tenía una osamenta de un niño de 8, a consecuencia del acetato de cortisona que ingería como parte de un tratamiento médico. El referido tratamiento se le aplicaba en cualquier momento en que padeciera desbalance emocional, estrés, fiebre, caídas, golpes, intervenciones quirúrgicas, aplicaciones de anestesia o golpes. Supuestamente, dicho tratamiento debería ser utilizado de por vida para evitar que muriera como consecuencia de un *shock*.

Igualmente, surge de las alegaciones de la demanda, que en el año 1976, a Ana se le practicó otra intervención quirúrgica en el clítoris. Para el año 1981, fue hospitalizada en el Hospital Universitario de Centro Médico en Río Piedras a fin de practicarle una cistoscopia y un vaginograma. Al año siguiente, Ana dejó de tomar el acetato de cortisona. Se alegó además, que el Dr. Carlos Cintrón continuó brindándole tratamiento endocrinológico pediátrico hasta la edad de 18 años.

Asimismo, se indicó en la demanda que en el año 1991, Ana fue referida a la Dra. Miguelina Cabral, quien le informó que el diagnóstico de hiperplasia adrenal congénita era erróneo y lo refirió para el Departamento de Urología del Centro Médico. Sin embargo, se desprende de las alegaciones que no fue hasta julio de 1992 que madre e hija descubrieron que ésta realmente había sido sometida a una operación de cambio de sexo. Alegadamente, se enteraron de este hecho al visitar a un endocrinólogo privado, que emitió el diagnóstico correcto.

A la luz de las alegaciones mencionadas anteriormente, la parte demandante reclamó daños. Su alegación principal es que se encuentra atrapada en órganos femeninos, a pesar de que su sexo dominante es el masculino y que se siente como hombre sicológica y físicamente. De ese modo, alegó que dicha situación le produce deformidad física y confusión.

Argumentó que los daños sufridos son consecuencia de la negligencia de los demandados. Expresó que la parte demandada fue negligente al: 1) emitir un diagnóstico incorrecto, durante un padecimiento de fiebre que interfirió con los niveles de esteroides producidos por la adrenal; 2) prescribirle un tratamiento inadecuado; 3) realizarle una operación de cambio de sexo a una edad en que el sexo dominante todavía no se había manifestado; y 4) no practicarle una laparoscopía o laparotomía para visualizar los gónados, a fin de evitar que tuviera ovario y testículo a la vez.

Antes de la presentación de dicha demanda, para el 5 de marzo de 1992, el Lic. Ángel Sitiriche había notificado al Secretario de Justicia de una posible reclamación contra el E.L.A. Además, el 25 de marzo del mismo año, había solicitado al tribunal que le ordenara al Hospital Universitario entregar a su representada, copia de su voluminoso expediente médico. Solicitó que el mismo fuera entregado libre de costo alguno, porque se trataba de una persona indigente. Es preciso señalar que al presentar la primera demanda, ya el Lic. Sitiriche no fungía como representante legal de la parte demandante.

No obstante, el 16 de diciembre de 1993, la parte demandante presentó un aviso de desistimiento sin perjuicio de la demanda presentada a tenor con la Regla 39.1 de Procedimiento Civil, 32 L.P.R.A. Ap. III. Para entonces, compareció representada por el Lic. Luis Rafael Rivera. El tribunal declaró *"Con Lugar"* el desistimiento.

El 14 de diciembre de 1994 Ana y su madre presentaron nuevamente una demanda contra las mismas partes. El E.L.A. presentó una moción en la cual solicitaba la desestimación de la demanda por prescripción. Argumentó que de la demanda surgía que en julio de 1992, la parte demandante descubrió que le habían practicado una operación de cambio de sexo en la infancia, pero había notificado al Secretario de Justicia su intención de demandar desde marzo del mismo año. Amparado en la fecha de la notificación al Secretario de Justicia, el E.L.A. argumentó que la acción había prescrito al momento de presentar la demanda el 14 de diciembre de 1994.

Por otro lado, el Dr. Cintrón también solicitó que la demanda fuera desestimada por prescripción, toda vez que de las alegaciones de la misma se desprendía que la parte demandante tuvo conocimiento del daño y el autor para julio de 1992 y no fue hasta el 1994 que incoó su acción. ■ La parte demandante se opuso a la pretensión de los demandados, amparada en el argumento de que conoció con exactitud el daño y los causantes cuando recibió el informe emitido por el Dr. Morales. Posteriormente, la U.P.R., de igual forma, solicitó la desestimación por el fundamento de prescripción extintiva.

Ante ese cuadro, el tribunal de instancia dictó una sentencia sumaria parcial, mediante la cual desestimó la demanda contra el E.L.A. Oportunamente, la parte demandante solicitó reconsideración a la sentencia sumaria parcial. Acompañó su solicitud con el informe del Dr. Morales, el cual no estaba fechado.

Denegada su solicitud, acudió al antiguo Tribunal de Circuito de Apelaciones mediante recurso KLAN-1996-00558. Señaló que erró el tribunal de instancia al dictar sentencia sumaria parcial a favor del E.L.A. en virtud de la notificación al Secretario de Justicia, a pesar de la existencia de una primera demanda interruptora del término prescriptivo. En apoyo de su contención, argumentó que se trataba de un caso complejo y poco usual, en el cual el demandante había tenido dificultad en determinar cuáles fueron los daños causados y los causantes de los mismos.

El 25 de septiembre de 1997, el foro apelativo confirmó la sentencia sumaria parcial. Fundamentó su dictamen en que ya para el 5 de marzo de 1992, cuando envió la notificación al Secretario de Justicia, conocía la causa del daño alegado y los causantes del mismo, por lo que para entonces estaba en posición de presentar su demanda. Inconforme con el dictamen, la parte demandante presentó un recurso de *certiorari* ante el Tribunal Supremo, que fue resuelto mediante sentencia el 23 de febrero de 1998.

El Alto Foro revocó el dictamen del tribunal intermedio y devolvió el caso para el foro de instancia. Ordenó que se celebrara una vista evidenciaria, en la que ambas partes presentaran prueba a fin de ilustrar al juzgador sobre el momento en que la parte demandante conoció el daño con la certeza necesaria para incoar su causa de acción. Razonó el Tribunal Supremo que en este caso no procedía dictar sentencia sumariamente, ya que la parte demandante había controvertido las alegaciones de los demandados con prueba documental que establecía controversia real sobre un hecho sustancial.

En cumplimiento con lo ordenado por el Tribunal Supremo, el foro de instancia celebró la vista evidenciaria durante las fechas: 9 de mayo de 2002, 13 de agosto de 2003 y 11 de septiembre de 2003. Testificaron el Dr. Morales, Ana y su madre, Angélica. Además, las partes estipularon el testimonio del Lic. Ángel Sitiriche.

Evaluada la totalidad de la prueba, el tribunal emitió el dictamen que revisamos. Mediante el mismo, determinó que la causa de acción no estaba prescrita. Fundamentó su conclusión en el testimonio de Ana, el cual le mereció entero crédito. El juzgador entendió que la parte demandante había probado mediante preponderancia de prueba, que había consultado y contratado con el Lic. Sitiriche, para un cambio de nombre y no para un caso por impericia médica.

Igualmente, razonó que aun de las declaraciones del referido letrado surgía que la carta enviada al Secretario de Justicia no fue otra cosa que una medida de cautela para notificar al E.L.A acerca de una posible acción en su contra. Asimismo, evaluó el hecho de que en ningún momento el letrado aseguró haber consultado o asesorado a Ana sobre la carta.

A la luz de toda la evidencia documental y testifical que presentaron las partes, el foro de instancia determinó que "*el conocimiento efectivo y necesario de los daños sufridos, su extensión y los causantes de los mismos, fue obtenido tanto por el demandante Luna como por su señora madre, la codemandante Martínez, por medio del informe del Dr. Morales Pereira.*" De ahí que dejó sin efecto la desestimación de la demanda por prescripción.

Inconforme, la U.P.R. presentó oportunamente una moción de reconsideración, la cual fue acogida y posteriormente denegada por el tribunal. Así las cosas, presentó el recurso de *certiorari* que nos ocupa. Arguye que el foro de instancia erró al omitir consignar determinaciones de hechos basadas en la totalidad de la prueba desfilada, que demuestra que la parte recurrida contaba con los elementos necesarios para incoar su acción antes de la fecha en la que efectivamente presentó la demanda. Además, aduce que incidió el referido foro al estimar que la causa de acción no está prescrita en virtud de la teoría cognoscitiva del daño y la normativa establecida en *Vera Morales v. Bravo Colón*, **2004 J.T.S. 40**, op. 27 de febrero de 2004.

Habiendo estudiado con detenimiento la totalidad del expediente, nos encontramos listos para resolver a la

luz del derecho aplicable.

## II

La prescripción extintiva es una institución de derecho sustantivo regulada por el Código Civil. Constituye una forma de extinción de un derecho, que es causada por la inercia de quien viene obligado a ejercerlo durante un tiempo determinado. *Santiago Rivera v. Ríos Alonso,* **2002 J.T.S. 21,** op. 7 de febrero de 2002; *Galib Frangie v. El Vocero,* 138 D.P.R. 560 (1995); *Cintrón v. E.L.A.,* 127 D.P.R. 582 (1995).

La institución de la prescripción extintiva aspira a asegurar la estabilidad de la propiedad y la certidumbre de los derechos. Por un lado, está el interés de salvaguardar un derecho, y del otro, darle carácter definido a la incertidumbre de una posible reclamación. Sin embargo, ninguno de los intereses es absoluto, sino que deben ser aquilatados en su justa proyección. *Santiago Rivera v. Ríos Alonso, supra; Vega v. J. Pérez & Cía, Inc.,* 135 D.P.R. 746 (1994); *Colón Prieto v. Géigel,* 115 D.P.R. 232 (1984). Es decir, la prescripción no es una figura rígida, sino que admite ajustes judiciales, según sea requerido por las circunstancias particulares de los casos y la noción sobre lo que es justo. *Vera Morales v. Bravo Colón, supra.*

A tales efectos, el Artículo 1868, 31 L.P.R.A. § 5298, establece que la acción para exigir la responsabilidad civil por las obligaciones derivadas de la culpa o negligencia prescribe en el transcurso de un (1) año, desde que lo supo el agraviado. Más adelante, el Artículo 1869, 31 L.P.R.A. § 5299, dispone: *"El tiempo para la prescripción de toda clase de acciones, cuando no haya disposición especial que otra cosa determine, se contará desde el día en que pudieron ejercitarse."*

Los Artículos 1868 y 1869 del Código Civil, *supra,* atemperados por nuestro más alto tribunal, pautan un criterio flexible en cuanto al cómputo del término prescriptivo en las acciones por daños y perjuicios, conocido como la teoría cognoscitiva del daño. A tenor con dicha teoría, el término prescriptivo de un año comienza a partir de la fecha en que el perjudicado conoció del daño y el autor del mismo, que es cuando realmente cuenta con los elementos necesarios para poder ejercitar su causa de acción efectivamente. *Montañez v. Hospital Metropolitano,* **2002 J.T.S. 80,** op. 24 de mayo de 2002; *Riley v. Pacheco,* 119 D.P.R. 762 (1987); *Colón Prieto v. Géigel, supra.*

No obstante, si el desconocimiento que impide ejercer la causa de acción se debe a la falta de diligencia del reclamante, a nadie más que a él pueden atribuirse las consecuencias de tal descuido. Ante esa circunstancia, no procede la reserva del derecho o un aplazamiento en el inicio del plazo prescriptivo. *Montañez v. Hospital Metropolitano, supra; Vega Lozada v. J. Pérez y Cía., supra; Colón Prieto v. Géigel, supra.*

Ahora bien, la determinación del momento exacto en que se conoce o debió conocerse el daño (*punctum temporis*), constituye materia de prueba e interpretación. *Ortega et al. v. Pou et al.,* 135 D.P.R. 711 (1994); *Rivera Encarnación v. E.L.A.,* 113 D.P.R. 383 (1982). La dificultad reside en la variedad de circunstancias en las que se llega a conocer el daño, pues hechos distintos requieren distintas soluciones. *Rivera Encarnación v. E.L.A., supra.*

Por otro lado, el Artículo 1873 del Código Civil, 31 L.P.R.A. § 5303, establece que el término prescriptivo de las acciones puede interrumpirse de cualquiera de las siguientes tres formas: 1) mediante su ejercicio ante los tribunales, 2) por reclamación extrajudicial; o 3) por acto de reconocimiento del deudor. El efecto de la interrupción eficaz de ese término es el comienzo del cómputo nuevamente a partir del acto interruptor. *De León v. Caparra Center,* 147 D.P.R. 797 (1999); *Cintrón v. E.L.A., supra.*

Los requisitos de los actos interruptivos son: a) *oportunidad,* lo cual requiere que se realice antes de la consumación del plazo; b) *legitimación del reclamante,* según la cual la reclamación debe hacerla el titular del derecho; c) *idoneidad* del medio utilizado para realizar la reclamación; y d) *identidad* entre el derecho

reclamado y aquél afectado por la prescripción. La interrupción concebida en el Código Civil es la manifestación inequívoca de quien amenazado con la pérdida de su derecho, expresa su voluntad de no perderlo. *Galib Frangie v. El Vocero de P. R.,* 138 D.P.R. 560 (1995); *De León v. Caparra Center, supra.*

En el caso de autos, el 5 de marzo de 1992, el Lic. Sitiriche notificó al Secretario de Justicia de una posible reclamación contra el E.L.A. De la referida comunicación surge que: *"...el Estado podría estar implicado en una acción civil"..."por motivo de una confusión de una doctora que determina que el bebé es niña cuando en realidad es varón."* Veinte días después, el referido letrado solicitó al tribunal que le ordenara al Hospital Universitario que le entregara copia del voluminoso expediente a su representada, libre de costo alguno, por tratarse de una persona indigente.

De la petición, se desprende que a la peticionaria se le realizaron unas operaciones de cambio de sexo en dicho hospital, *"las cuales a la fecha de la presente están siendo investigadas por los abogados para poder determinar la existencia de una posible negligencia médica".* Más adelante, el letrado expresó: *"Que esperamos que exista la posibilidad de una acción civil en daños y perjuicios que dependerá grandemente de que la parte aquí compareciente pueda tener acceso a dicho expediente, examinarlo y ofrecerlo a un médico especialista en Urología para que examine el mismo y pueda hacer una determinación de manera responsable al aquí compareciente en cuanto a dichas operaciones."*

El 28 de junio de 1993, Ana y su madre presentaron una demanda por impericia médica. No obstante, el 16 de diciembre de 1993, la parte demandante presentó un aviso de desistimiento sin perjuicio de la demanda presentada a tenor con la Regla 39.1 de Procedimiento Civil, 32 L.P.R.A. Ap. III. Nuevamente, Ana y su madre presentaron una demanda contra las mismas partes el 14 de diciembre de 1994.

La parte demandante declaró que tuvo conocimiento del daño que se le había ocasionado y quiénes eran los causantes cuando recibió el informe emitido por el Dr. Morales. T.E. págs. 53-54, 131. Tanto del testimonio del Dr. Morales como de Ana, se desprende que el referido informe fue entregado entre enero y febrero del año 1993, pero nunca después del 3 de marzo de 1993, cuando Ana emitió un giro bancario por la cantidad de $250.00 en pago de honorarios. T.E. págs. 9, 11-12, 17, 19, 25, 46, 51. Ese mismo día, Ana logró leer el contenido del informe. T.E. pág. 52.

Ese informe contiene varios de los señalamientos de negligencia que se imputan en la primera demanda y posteriormente fueron reproducidos en la segunda. Es preciso acotar que por la complejidad que envuelve el caso de Luna, el Dr. Morales aconsejó que su expediente fuera evaluado minuciosamente por un endocrinólogo o a un endocrinólogo-ginecólogo.

Reiteradamente, Ana negó tener conocimiento de las gestiones del Lic. Sitiriche encaminadas a llevar una causa de acción por impericia médica. Por el contrario, sostuvo que al solicitar los servicios profesionales del letrado, su intención era que le llevara un procedimiento legal de cambio de nombre o *ad perpetuam.* T.E. págs. 32-33, 35, 103, 106. Así lo corroboró el letrado durante su deposición del 10 de febrero de 1999. T.E. págs. 9, 12, 24-25, 28.

A tono con lo anterior, Ana negó que su intención original fuera llevar una acción por negligencia médica y que al momento de visitar al Lic. Sitiriche, conociera de su padecimiento. T.E. págs. 111-112. Igualmente, negó conocer la existencia de la carta suscrita por el Lic. Sitiriche a fin de notificar al Secretario de Justicia de una posible causa de acción en contra del E.L.A. T.E. págs. 54-55, 114. Al respecto, el letrado admitió que enviaba siempre esa carta para librarse de responsabilidad en caso de que en el futuro presentara una demanda. T.E. 10 de febrero de 1999, págs.18-19, 24; T.E. 23 de agosto de 2001, pág. 15.

Ana reafirmó que desconocía cómo el letrado advino en conocimiento de la información que manifestaba,

puesto que únicamente le informó que padecía de hiperplasia adrenal congénita. T.E. págs. 33-34, 76, 97-99. Además, declaró que autorizó a su representante legal a solicitar su récord médico a los únicos efectos de que llevara el procedimiento de cambio de nombre. T.E. págs. 35-36, 107.

Asimismo, Ana testificó que no firmó contrato alguno por honorarios, sino un papel en blanco para solicitar el récord médico, pero luego dijo que no leyó ni vio la marca en la parte de la naturaleza del caso sobre daños. T.E. págs. 56, 93-94, 123. Del mismo modo, declaró que tampoco leyó la declaración jurada que acompañaba la petición al tribunal para que autorizara la entrega de copia del récord médico. T.E. págs. 99-102, 116-118, 121-122.

Por su parte, el Lic. Sitiriche indicó que *"siempre hubo la posibilidad de radicar una demanda"*. Sin embargo, sobre ese asunto, expresó: *"en aquel momento era muy prematuro, porque ni yo sabía lo que estaba pasando y yo lo que entiendo que Ana Luna estaba un poco confundido en cuanto a que era lo que estaba pasando en su vida..."* Más adelante, declaró: *"Sí se estaba claro con su situación sexual..., que siempre lo hicieron nena y después se convirtió en un hombre y estaba con su compañera, pero la certeza de qué fue lo que pasó, nunca lo tuvo claro como tal."* T. E. 23 de agosto de 2001, pág. 13.

El abogado manifestó tener interés en la situación médica de Luna para el caso del cambio de nombre. T. E. 23 de agosto de 2001, pág. 14. De hecho, el licenciado expresó que habló con una doctora por la cuestión del sexo, pero no por un posible caso de mala práctica médica. T.E. 10 de febrero de 1999, págs. 29, 31.

El Lic. Sitiriche no estableció que a la fecha de contratarlo, Ana tuviera conocimiento del daño. Por el contrario, reconoció que lo visitó para un cambio de nombre y con ese propósito, él le requirió el récord médico a fin de plantear el *ad perpetuam* en el tribunal. Es más, en sus declaraciones durante ambas deposiciones, el abogado se refería a la posibilidad de establecer una demanda en daños, para lo cual debía primero documentarse e investigar. Así también, se refirió al contrato por servicios profesionales: *"si esto redunda en una demanda, eventualmente tengo que tener un contrato con esta persona."* T. E. 23 de agosto de 2001, pág. 14. Asimismo, de la notificación al Secretario de Justicia y al solicitar al tribunal que le ordenara al Hospital Universitario que le entregara copia del expediente médico, surge meramente la posibilidad de incoar una causa de acción en su día, de descubrirse que existió negligencia médica.

Con relación al referido de la Dra. Angelina Cabral al Departamento de Urología de Centro Médico, Ana indicó que la razón para ello fue que estaba mal de los riñones. T.E. pág. 64. Expresó que desconocía el contenido del referido porque iba sellado. T.E. pág. 71. De la misma forma, aseguró que no le expresó a la doctora su deseo de someterse a una cirugía reconstructiva, porque desconocía de la existencia de una intervención quirúrgica de esa índole. Dijo que fue la doctora quien le habló sobre el tema. T.E. pág. 72.

No obstante, del referido de la doctora al Hospital Universitario, se desprende que el paciente interesaba una cirugía reconstructiva que no estaba disponible en el Hospital Municipal de Caguas. Sobre el particular, Luna declaró que la doctora le preguntó si le habían extirpado los testículos, le contestó en la negativa y le contó que sólo le hacían resecciones del clítoris. T.E. pág. 83.

Si bien la Dra. Cabral manifestó en su referido que la paciente requería una cirugía reconstructiva, que no existía en el hospital, ello no implica que para entonces, Ana tuviera conocimiento de los daños ocasionados y el causante de los mismos. En ningún momento, la doctora manifiesta que se encontraba ante un caso de impericia médica o que le habían diagnosticado o tratado erróneamente.

Por otro lado, Ana admitió que le manifestó al urólogo que se sentía como un hombre y éste lo refirió a una evaluación psiquiátrica. A la psiquiatra también le manifestó que se sentía como hombre. T.E. págs. 74-75. Sobre ese sentir, declaró durante el contrainterrogatorio: *"Yo siempre me he sentido como un varón."* T.E. pág.

82. Sin embargo, expresó que ninguno de esos médicos que visitó, le informó que el diagnóstico de su enfermedad era incorrecto. T.E. págs. 113-114.

No hablamos aquí de un daño constitutivo de una lesión corporal por la presencia de manifestaciones e indicios exteriores o físicos, como en el caso de *Vera Morales v. Bravo Colón, supra.* En el mencionado caso, la paciente razonablemente debió haber reconocido el sufrimiento del daño e identificado el causante del mismo en el término prescriptivo de un año desde que se enteró que fue intervenida en su ovario derecho y no el izquierdo, que era el verdaderamente afectado; se enteró de la presencia de laceración de su uréter derecho y que sufrió la extravasación de orina provocada por esa razón. De ahí que nuestro más alto foro expresó que no es necesario que el perjudicado conozca toda la magnitud y extensión de las consecuencias lesivas de las lesiones corporales, ya que tal extremo puede ser establecido en un momento posterior durante el proceso jurídico para su reparación. *Íbid.*

Ahora bien, es el tribunal el que va a determinar si el perjudicado ejerció la diligencia de un hombre razonable y prudente, atendidas las circunstancias particulares de cada caso. Para ello debe evaluar si el reclamante tenía ante sí suficientes manifestaciones e indicios exteriores del sufrimiento de un perjuicio potencial, para identificar lo más prontamente que fuese posible la existencia de un daño, para efectos del comienzo del transcurso del plazo prescriptivo de un (1) año para incoar su acción. *Íbid.*

Los tribunales deberán determinar bajo el estándar de un hombre razonable y prudente, si el perjudicado debió reconocer que se le había infringido un daño. Es necesario evaluar si la suficiencia de esos indicios y manifestaciones razonablemente podían llevarlo a concluir que se había producido tal daño, aunque en ese momento no pudiera conocer con certeza la totalidad de su magnitud. *Íbid.*

El juzgador deberá preguntarse si la prueba sobre el conocimiento del daño sería suficiente para apoyar una reclamación de indemnización por este daño y si es persuasiva a los efectos de reconocer la existencia del mismo y, por ende, conceder el resarcimiento reclamado. Si la prueba no es suficiente para lo uno, tampoco debe serlo para lo otro. *Íbid.*

Si no se puede determinar a base de lo alegado y de la prueba presentada para sostenerlo que sufrió un daño para los efectos de conceder indemnización, tampoco puede concluirse que el perjudicado tuvo conocimiento de algo inexistente. Sería antijurídico e injusto exigir un *quántum* de prueba que resulte insuficiente sobre la existencia de un daño para conceder indemnización al perjudicado y que, a su vez, resulte suficiente para determinar que su acción está prescrita porque éste tuvo conocimiento de algo que no existe para efectos de la adjudicación en sus méritos de lo reclamado. *Íbid.*

Al ser cuestionada porqué había esperado tanto para ser evaluada por otro médico, Ana expresó que confió en la opinión médica de las *"eminencias en el Centro Médico."* T.E. pág. 82. Sobre este punto, es necesario enfatizar que del récord médico surge una nota que refleja que la madre de Luna ignoraba sobre la posibilidad de que el paciente tuviera testículos en la cavidad abdominal y que nunca debía informársele por razones psicológicas, por lo que el hijo debía crecer como una niña.

El hecho de que Ana siempre se haya sentido como un hombre, se comportara como hombre y se viera como tal, no implica sin más que conocía o debía conocer que los médicos habían diagnosticado su condición erróneamente. Ese era sólo su sentir, sin ninguna constancia científica de que en efecto fuera un hombre.

El sentirse hombre no obliga a una persona razonable y prudente a buscar más opiniones médicas, si no tiene porqué dudar de los galenos que lo habían atendido hasta sus 18 años. No estamos hablando de un sólo médico que quizás no tuviera tanta experiencia o conocimientos médicos para diagnosticar su caso, sino de doctores especialistas que trabajaban en un hospital con el personal y los medios tecnológicos suficientes para

que cualquier persona razonablemente prudente entendiera que podían emitir un juicio médico acertado, sin que hubiera razón alguna para poner en duda su diagnóstico y recomendaciones.

Por otro lado, las visitas de Ana a distintos especialistas por causa de referidos, tampoco ponen de manifiesto que ellos le indicaran que había existido error alguno al diagnosticar y tràtar su caso. Aun si hubiera estado interesada en efectuarse un cambio de sexo y ese fuera el motivo de la visita a la Dra. Cabral, ello no implica que conocía que su sexo dominante era el masculino y los médicos lo habían diagnosticado y tratado erróneamente.

A la luz de toda la evidencia presentada por las partes, concurrimos con el tribunal de instancia en que el conocimiento efectivo y necesario de los daños sufridos, su extensión y los causantes de los mismos, fue obtenido tanto por la parte demandante a través del informe del Dr. Morales. Antes de eso, el propio Lic. Sitiriche reconoció que ni Ana ni él sabían a ciencia cierta qué había ocurrido. Un análisis minucioso del expediente del caso no produce insatisfacción de conciencia ni estremece nuestro sentido de justicia y la determinación del tribunal representa el balance más racional, justiciero y jurídico de la totalidad de la prueba. *Floresuv. Domínguez*, 146 D.P.R. 45 (1998); *Zambrana v. Hospital Santo Asilo de Damas,* 109 D.P.R. 517 (1980).

No intervendremos con la apreciación de la prueba desfilada o con la adjudicación de credibilidad que hizo el juzgador de los hechos, salvo que haya mediado pasión, prejuicio, parcialidad o error manifiesto. *Rodríguez v. Nationwide Insurance* **2002 J.T.S. 61**, op. 18 de abril de 2002; *Colón v. Tienda Kmart,* **2001 J.T.S. 98**, op. 26 de junio de 2001; *Rolón García v. Charlie Car Rental, Inc.* 148 D.P.R. 420 (1999); *López Vicil v. I.T.T. Intermedia, Inc.,* 142 D.P.R. 857 (1997); *Velázquez v. Ponce Asphalt*, 113 D.P.R. 39 (1982). Regla 43.2 de las de Procedimiento Civil, 32 L.P.R.A., Ap. III. La apreciación de la prueba por el tribunal de instancia merece nuestra deferencia; más aún cuando están envueltas cuestiones altamente subjetivas, ya que el juzgador de los hechos que oyó y vio declarar a los testigos y apreció su comportamiento en la silla testifical, es quien está indudablemente en mejor posición para aquilatar la prueba testifical desfilada. *López Vicil, v. I.T.T. Intermedia, Inc., supra.*

Hemos estudiado detenidamente la totalidad del expediente y entendemos que la parte demandante cumplió con su deber de demostrar mediante preponderancia de prueba el momento en que conoció de los daños. No habiendo demostrado la parte recurrente que el foro de instancia incurrió en prejuicio, parcialidad o error manifiesto, no dejaremos sin efecto su apreciación de la prueba, pues su actuación merece toda nuestra deferencia.

Por todo lo antes expuesto, se deniega la expedición del auto de *certiorari* solicitado. Se devuelve el caso para la continuación de los procedimientos de conformidad con el dictamen emitido.

Así lo pronunció y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Laura M. Vélez Vélez
Secretaria del Tribunal de Apelaciones